**DAYTON CHRISTIAN SCHOOLS, et al., Plaintiffs,**

**v.**

**OHIO CIVIL RIGHTS COMMISSION, et al., Defendants.**

**No. C–3–80–410.**

United States District Court, S.D. Ohio, W.D.

Jan. 6, 1984.

William B. Ball, Harrisburg, Pa., Bruce E. Pence, Dayton, Ohio, for plaintiffs.

Keith S. Mesirow, Asst. Atty. Gen., Columbus, Ohio, for defendants.

DECISION AND ENTRY DENYING PLAINTIFFS' REQUEST FOR A PERMANENT INJUNCTION; JUDGMENT TO BE ENTERED FOR DEFENDANTS; TERMINATION ENTRY

RICE, District Judge.

The merits of the captioned cause are presently before the Court for a determination of whether a permanent injunction should be issued against the Ohio Civil Rights Commission ("OCRC" or "Commission") to enjoin it from investigating and conducting a hearing on a charge of sex discrimination and retaliatory employer practices against the Dayton Christian Schools (DCS) leveled by a former teacher, Mrs. Linda Hoskinson.

Counsel for the parties agreed to consolidate the hearing on Plaintiffs' request for a preliminary injunction with the hearing on the merits of the captioned cause, pursuant to Fed.R.Civ.P. 65(a)(2).

Plaintiffs consist of DCS as an entity; Patterson Park Church; Christian Tabernacle; Claude E. Schindler, superintendent of DCS; Stephen T. House, M.D. (School Board Member at DCS), and his wife, Camilla House, parents; and Paul Pyle, a teacher at DCS. Defendants are the Ohio Civil Rights Commission, its Commissioners, two Directors of the OCRC, and the Attorney General and Assistant Attorney General of Ohio. All Plaintiffs allege that their first amendment rights to freedom of religion will be violated if the OCRC is permitted to exercise jurisdiction over the school. The complexity of the problem presented to the Court stems from the pervasively religious orientation of DCS and the need to determine if the state's attempt to regulate an aspect of the operation of that school impermissibly runs afoul of the proscriptions set forth in either the free exercise or establishment clauses of the First Amendment to the United States Constitution.

The issue before this Court is whether the OCRC may exercise jurisdiction over DCS to investigate and to conduct a hearing on a charge that the school discriminated on the basis of sex and/or engaged in prohibited retaliatory employer practices when it terminated a female teacher's employment contract. Having conducted a hearing on this matter and having carefully reviewed the evidence and the arguments presented by the parties, the Court, as set forth in the opinion below, finds that a permanent injunction should not issue and therefore denies Plaintiffs' request for same.

I. *Findings of Fact*

A. *Purpose and Mission of Dayton Christian School*

Dayton Christian Schools, Inc., is a private nonprofit corporation that provides education both to elementary and high school students (Exhibit 1, Page 71 1B07). The exhibits and testimony introduced at the hearing on this matter all support the finding that, from its inception, DCS has had a

dominant religious purpose which permeates both the administrative and substantive aspects of the school. When first incorporated, the school outlined its purpose and objectives as follows:

(1) Principal purpose ... is to provide a program of education in a positive Christian atmosphere offering regular courses of study in compliance with the laws and regulations of the State of Ohio.

(2) Other purposes and objectives are:

(A) to provide for the students and faculty (an) ... environment commensurate with an institution having ultimate objectives which are Christ-centered.

(B) to teach all subjects in a manner to create in each student an awareness of God's Supreme authority over all creation.

(C) to present the Bible, God's Word, as the only reliable and true revelation of God's nature and His redeeming purpose and will for mankind.

(D) to teach that the Lord Jesus Christ is the Son of God who came to earth to die for our sins.

(E) to train and prepare youth to make worthy contributions to the Cause of Christ in the home, church and community.

(F) to help each student aspire to positions of responsibility in full or part-time Christian service, wherever that call for service may be.

(Exhibit 1, Page 71 1B06).

The preamble to the Constitution of Dayton Christian Schools, Inc. further delineates the school's religious purposes:

The corporation will provide an educational curriculum of the highest possible standards in order to prepare students for purposeful Godliness ... each student will be taught Christian Doctrine based on the Bible as the textbook authority for such instruction and learning.[1]

(Exhibit 1, Page 71 1C01).

As an administrative means of insuring continued efforts toward the pronounced goals, both the original and current constitution of the Dayton Christian Schools, Inc. delineate a Statement of Faith of religious precepts to which each member of the Board of Directors and educational staff is required to subscribe yearly. (Exhibit 23: Statement of Faith executed by Linda Hoskinson on April 17, 1978).[2]

Woven throughout most of the Plaintiff's exhibits introduced at the hearing is the advocacy of the religious philosophies and purposes of Dayton Christian Schools, Inc., as evidenced by the following compilation of exhibits.

(1) Dayton Christian Schools is an interdenominational ministry offering a Christ-centered education ... our goal is to provide a quality educational program that is based upon the Word of God (Exhibit 3, Page 1; cover letter to employment candidates);

(2) The entire process of education is seen as a means used by the Holy Spirit to bring the student into fellowship with God ... to assist him in developing a

---

1. These purposes are carried through to the present as reflected in Exhibit 2 which is the current constitution of the Dayton Christian Schools, Inc., and contains identical wording.

2. The Statement of Faith provides:

(1) I believe the Bible to be the inspired and the only infallible authoritative Word of God.
(2) I believe that there is one God, eternally existent in three persons: Father, Son, and Holy Spirit.
(3) I believe in the deity of our Lord Jesus Christ, in His Virgin Birth, in His sinless life, in His Miracles, in His vicarious and atoning death through His shed blood, in His bodily resurrection, in His ascension to the right hand of the Father, and in His personal return in power and glory.
(4) I believe that man is sinful by nature and that regeneration by the Holy Spirit is essential for his salvation.
(5) I believe in the continuing ministry of the Holy Spirit, by whose indwelling the Christian is enabled to live a Godly life.
(6) I believe in the resurrection of both the saved and the lost. They who are saved unto eternal life and they who are lost unto eternal damnation.
(7) I believe in the spiritual unity of believers in our Lord Jesus Christ.
(8) I believe in the creation of man by the direct Act of God.

Christian mind ... to train him in Christ-likeness (Exhibit 21, Page 5: Teacher's Manual);

(3) The authority for such an education comes from God's command ... the Christian School is an extension of the local evangelical fundamental church's Christian education program (*Id.*);

(4) In a Christian School, all studies and activities should be God-centered ... creating and developing a Christian mind is a foremost goal of the Christian School (*Id.* at Page 7);

(5) [the purpose is] to nourish dedicated disciples of our Lord Jesus Christ (*Id.* at Page 57);

(6) We feel strongly that according to God's Word, all Christian children belong in an educational system where Jesus Christ is preeminent (Collossians 1:18) (Exhibit 8: cover letter to parents).

The testimony of Claude Schindler, Superintendent of Dayton Christian Schools, Inc., identified the religious background from which the school emerged (T. 23) and substantiated that its purpose and mission are based upon religious precepts found in the Bible and carried out in such a manner so as to achieve a religious goal.

In the Bible, Deuteronomy, Chapter 6, Verses 5 through 7, parents are commanded to diligently train their children to love thy God with all their heart, soul and mind every moment of the day. We feel that the instruction we must give our children is there can't be any differentiation between secular and sacred, that God Himself is the center of all aspects of learning and everything that's God's (T. 32).

And thus, our mission at Dayton Christian Schools is, in essence, to be a servant to the home and to help Mom and Dad fulfill their Godly responsibilities. And that being our mission it then centers—then forms into the philosophy of education. And that philosophy is that our mission, our goal, is to help these young people become like Jesus Christ, to think like Him, to act like Him by demonstrating their characters and quali-

ties in their lives. We believe that is crucial, that a Christian becomes like Him. And thus, He becomes the focus in everything we do in our school (T. 33).

As no contrary evidence was presented by the Defendant as to the religious purpose and mission of the school, the Court concludes that the religious purpose and mission of Dayton Christian Schools, Inc., is for propagation of the Christian beliefs and faith and that this religious orientation is an integral part of the school's philosophy and operation. The aforesaid religious purposes are shown by the evidence to permeate the school's goals, curriculum and administration.

## B. *Biblical Chain of Command*

The basic religious philosophy of DCS is founded upon beliefs that are reflected in the members' Statement of Faith. (*See*, note 2, *supra*). Almost every aspect of the school's philosophy and approach to education emanate from principles found within the Bible. Of specific relevance to the present proceeding is the belief founded on Matthew 18:15–7 and Galations 6:1 that all those employed or enrolled at DCS always give a good report and adhere to a Biblical Chain of Command.

The Chain of Command refers to a scriptural belief (T. 72) in an authority structure. As explained by Claude Schindler in testimony given at trial:

The principle of giving a good report means that I will not give a bad report about someone else to another party, nor will I listen to a bad report from someone else about that party unless I am being asked, according to Matthew 18, to go as a witness.

In other words, I will not receive a bad report about a teacher from a parent unless that parent has first made contact with the teacher and as a result of that contact is not satisfied, then I will go along with that parent to the teacher to resolve it. If that doesn't resolve it, then the three of us, in turn, will go to our Board of Directors to resolve the conflict. That is what we will call the Chain

of Command as specified in Matthew, Chapter 18, Verses 15 through 17 (T. 75). The way the Scriptures teach, the way we are to love God is by our obedience. And we know the Scriptures teach that in obedience, there's [sic] certain authority structures that He has established and we feel that it is important that each teacher recognizes the authorities that have been placed over them as well as we expect the students to recognize the authority the teacher has over them and we expect them to respond to what is placed in front of them in the Teacher's Manual. But if they have a disagreement or do not concur with what is in the policy manual, they have an avenue open to them to come to us and discuss, according to Matthew, Chapter 18:15–17, and to air their concerns with reference to that particular policy. If they are not satisfied with that, they can—a procedure is established that they can go to the administrator and ultimately to the Board for resolving that particular conflict. Without that avenue open, we expect them to respond to what we ask them to do (T. 52–53).

Consistent with the above explanation is the Constitution of Dayton Christian Schools, Inc., which stipulates that one of the functions of the Board of Directors is to serve as a final Board of Appeals in all misunderstandings involving personnel employed by the Corporation (Exhibit 2, Article V, Section 1E).[3]

In summary, the concept of Chain of Command is closely intertwined with the concept of giving a good report, both of which are scripturally based explanations of an authority structure and, procedurally speaking, are somewhat akin to the legal concept of exhausting administrative remedies.

---

3. *See,* Exhibit 12, Item 19(i) which asks for a similar commitment from each student's parents.

4. By the provisions of this same contract, violation of any of its provisions by either of its parties entitled the nonbreaching party to void the contract (*Id.* at Item 14: T.84). A further source of authority for dismissal of an employee

## C. *The Discharge of Mrs. Hoskinson*

The following are the findings of fact concerning the discharge of Mrs. Hoskinson.

(1) In January of 1979, Mrs. Hoskinson informed the principal of DCS, James Rakestraw, that she was pregnant. (Final Pretrial Order, Doc. #12, p. 2).

(2) Subsequent to this conversation, Mr. Rakestraw discussed Mrs. Hoskinson's pregnancy with Mr. Claude Schindler who instructed Mr. Rakestraw to write Mrs. Hoskinson a letter stating "that because of our desire to have a mother home with pre-school age children, that she would not be issued a contract for the upcoming school year." (T. 67). The foundation for this belief was described by Mr. Schindler at trial in the following manner.

> We believe that the Bible teaches that even though we are equal in the sight of God, our role is different, the role of the female is different than that of the male. The Scripture teaches that in I Peter, Chapter 3, I Timothy Chapter 2, Titus, Chapter 2, just to mention a few passages of the Scripture. And in those passages it spells out the role of a woman. And my counseling with Mr. Rakestraw is based upon those principles in God's Words. And we felt they directly related to a woman being home with her pre-school age children. We rescinded the letter (sent February, 1979 to Linda Hoskinson) because after counseling, we found that we had not adequately explained this to our faculty and to our staff. And thus Mrs. Hoskinson was not fully aware of the convictions of the administration and of the School Board relative to this particular Biblical principle (T. 139–140).[4]

---

is found in the Constitution of Dayton Christian Schools, Inc., Article 8, Section 4, which states that "the Board of Directors shall have the right to dismiss any employee ... whose personal life or instruction conflicts with the basis and purposes of the corporation ...."

Therefore, the record supports the conclusion that, at least in the mind of Mr. Schindler, the nonrenewal of Mrs. Hoskinson's teaching contract was an act consistent with and compelled by religious beliefs.

(3) Pursuant to that discussion, Mrs. Hoskinson received a memorandum from Mr. Rakestraw on or about February 20, 1979, confirming that her teaching contract would not be renewed for the following school year (*Id.;* Exhibit A). The stated reason for nonrenewal was as follows:

> My concern ... was ... that as you will be a new parent (June) your teaching next year would be in contrast to the School's philosophy. As a school, we see the importance of the mother in the home during the early years of child growth. This is a factor we consider as we interview prospective teachers. If there are pre-school age children in the home we recommend the mother stay there and do not accept her application.

(Exhibit A).

(4) Mrs. Hoskinson was not aware that the school had a policy, whether based on religious precepts or not, concerning pregnancy. Based on the exhibits presented by Plaintiff, it appears that the School's philosophy concerning pregnancy was not anywhere specifically delineated for its employees. Further, Mr. Schindler acknowledged in his testimony that "We had not adequately explained this [philosophy] to our faculty and to our staff. And thus Mrs. Hoskinson was not fully aware of the convictions of the administration and of the School Board relative to this particular Biblical principle." (T. 140). Since there was nothing in writing, Mrs. Hoskinson had no way of knowing the policy (T. 128), although Mr. Schindler did assert that despite the lack of such documentation, the policy itself had not changed since its inception (T. 140).

(5) Having received this notification of nonrenewal, Mr. and Mrs. Hoskinson consulted with an attorney concerning her employment with Dayton Christian Schools, Inc. (Final Pretrial Order, Doc. # 12, p. 2). Mrs. Hoskinson's attorney subsequently wrote a letter to the Superintendent of DCS, Mr. Claude Schindler, concerning the February 20th memorandum of Mr. Rakestraw. In this letter, the attorney informed Mr. Schindler that the February 20th memorandum made it apparent that discriminatory practices existed at DCS (Exhibit B). Furthermore, in this letter the attorney informed Mr. Schindler that "[t]o preclude my client from further employment on the basis of pregnancy and child rearing constitutes violations of both state and federal discrimination laws ... should you not extend further employment to her on the basis of her pregnancy, we will have no alternative but to explore all state and federal administrative and court remedies." (*Id.*).

(6) On or about March 14, 1979, a meeting was held with Mrs. Hoskinson, Mr. Schindler and Mr. Rakestraw, in which Mrs. Hoskinson was informed that she was to be suspended effective immediately because she had gone to an attorney. (Final Pretrial Order, Doc. # 12, p. 3; Tr. 125 through 126).

(7) Mrs. Hoskinson was aware of the requirement that all teachers follow the Chain of Command prior to consulting her attorney and prior to her discharge.

In Hoskinson's employment contract the inquiry was made: "As a teacher in a Christian School, on what basis would you require obedience of your students?" Her handwritten reply was: "Obedience to those in authority over you is clearly stated in the Bible. I believe in God's Chain of Command." (Exhibit 25, Item 10). Thereafter, Linda Hoskinson entered into a contract with Dayton Christian Schools, Inc., and initialed a provision therein which required that she "agree to follow the Biblical pattern of Matthew 18:15–17 and Galatians 6:1 and always give a good report (with) all differences ... to be resolved by utilizing Biblical principles—always presenting a united front." (Exhibit 22, Item 13). This was the last employment contract signed by Linda Hoskinson (T. 65)

and was the contract in effect at the time of her discharge.[5]

Linda Hoskinson's own testimony acknowledged her awareness of the Biblical Chain of Command (T. 131) and that a passage in the Bible admonishes one Christian not to take another Christian to law. (T. 134–135).

Finally, evidence was presented showing that on a prior occasion (April, 1977), Linda Hoskinson failed to adhere to the Chain of Command principle (T. 90–91), was warned about this (T. 68), faced the possible jeopardy of being discharged at that time (Exhibit 29; T. 72, 91–92), but ultimately was rehired (T. 94).

(8) On March 15, 1979, Mrs. Hoskinson met with the governing Board of DCS in which meeting her pregnancy was discussed. (T. 127–129).

(9) On March 26, 1979, the Board met and the decision was made to discharge Linda Hoskinson (she was not present). (Exhibit 33, Page 2).

(10) On March 27, 1979, a correspondence sent to Linda Hoskinson rescinded the memorandum of February 20, 1979, and gave notice of her termination due to serious philosophical differences as evidenced by her violation of Paragraph 13 of her employment contract executed April 17, 1978 (failure to follow the Biblical Chain of Command). (Exhibits D and E). Paragraph 13 provides:

> The Teacher agrees to follow the Biblical pattern of Matthew 18:15–17 and Galations 6:1 and always give a good report. All differences are to be resolved by using Biblical principles—always presenting a united front.

(11) The eventual discharge of Mrs. Hoskinson stemmed from the fact that she contacted an attorney in response to actions taken by the school regarding her employment. As demonstrated by Plaintiffs' testimony and exhibits, this consultation with an attorney constituted a breach of the Chain of Command. The pertinent parts of the record follow:

> Mrs. Hoskinson was terminated because of the violation of I Chronicles, Chapter 6, Versus 1 through 8, and Matthew, Chapter 18, Versus 15 through 17, which is a violation of the Chain of Command in seeking to resolve a conflict outside the church community. (T. 68: testimony of Claude Schindler);

> The Board ... has concluded that there is a serious philosophical difference between Linda Hoskinson and Dayton Christian Schools. This has been evidenced by violation of Paragraph 13, contained in her employment contract. (Exhibit 33: minutes of Board meeting; Exhibit D: Termination letter);

> She was discharged because she violated her employment contract, and the time we had a hearing to discuss that she would not talk to the Board with regard to that. (T. 147) Specifically, the contract was violated in No. 13, specifically talking about Matthew 18:15–17 and Galatians 6:1, with reference to always giving a good report. (T. 148: testimony of Stephen House, School Board Member at DCS);

> I was told in the meeting on March 14th at the close of the meeting that I was being suspended because I went to the law, because I talked to a lawyer. (T. 124: testimony of Linda Hoskinson).

Thus, the record reveals that the immediate ostensible precipitating cause of Mrs. Hoskinson's discharge was the fact that she went to an attorney to obtain advice and assistance in resisting the decision not to renew her contract because she was pregnant. The Court notes, however, that for the purposes of determining whether the OCRC may exercise jurisdiction over DCS with regard to Mrs. Hoskinson's discharge, it matters not what the *Court* views to be the true or actual reason why Mrs. Hoskinson's teaching contract was terminated. What does matter is the manner in which

---

**5.** Note that Plaintiffs have included this role differentiation into their new employment contract for teachers. *See,* Exhibit 12, Item 13.

the *OCRC* views Mrs. Hoskinson's discharge and whether the OCRC may exercise jurisdiction over DCS to investigate her discharge given the religious nature of the school and the asserted religious basis for both the initial decision not to renew her contract and the subsequent decision to terminate her contract for having consulted an attorney.

(12) On March 28, 1979, Mrs. Hoskinson filed a Charge of Discrimination with the Ohio Civil Rights Commission in which she asserted that she believed DCS had discriminated against her on the basis of sex because of the nonrenewal of her teaching contract for the given reason that she was pregnant and because of the subsequent action of the Board in dismissing her for having consulted an attorney. (Exhibit No. 35).

(13) On April 18, 1979, the OCRC notified counsel for DCS of the charge against the school, suggested that DCS consider "adjustment of the matter," and indicated that a preliminary investigation of the charge had been initiated. (Exhibit No. 36).

(14) On May 14, 1979, the OCRC contacted DCS once again to urge adjustment of the charge and to notify the school that failure to adjust would result in a formal investigation being initiated. (Exhibit No. 37).

(15) On October 29, 1979, the OCRC provided counsel for DCS with written confirmation of the information it would want made available at the investigative conference scheduled to take place at DCS on November 16, 1979. The following information was requested:

1. EEO/OCRC–53 employment data on Respondent for 1977 to the present. A blank OCRC–53 is enclosed for your convenience.

2. Blank employment application form(s) currently used by Respondent.

3. Employee handbooks and rules and regulations for the period January 1, 1977 to the present.

4. Written Respondent policy on the specific factors and procedures involved in the following for the period January 1, 1977 to the present: disciplinary actions, up to and including discharge; employee pregnancies; oral and written performance evaluations; performance standards; employees working with preschool children; contract renewal; employee grievance procedures; employees resorting to the legal system in grievances with Respondent; determination of "serious philosophical differences"; inquiries into employees' financial status and babysitting plans.

5. Complete job descriptions and model contracts for the teaching position held by Complainant, from January 1, 1977 to the present.

6. A list of all Respondent employees who were pregnant during the period January 1, 1977 to the present, including: name; date of hire; dates of pregnancy; any change in status of employee while pregnant or afterward, including persons recommending change (name, sex, title), reason for change.

7. A list of all employees suspended and/or discharged from January 1, 1977 to the present, including: name; sex; date of hire; position(s) held, with dates; date of suspension/discharge; reason for suspension/discharge; person recommending suspension/discharge (name, sex, title).

8. A written position statement regarding each of Complainant's allegations.

9. Minutes of Respondent's Board of Directors meetings for March 15 and 26, 1979.

10. Complete personnel files for Complainant [and other specified individuals]. *Id.*

DCS was also advised that the OCRC wanted to interview Mr. Claude Schindler, Jr., Mr. Jim Rakestraw, Mr. Dan Grable, and any other witnesses DCS wished to use to respond to Mrs. Hoskinson's charge. *Id.*

(16) On January 28, 1980, the OCRC informed counsel for DCS that, having completed its preliminary investigation of Mrs. Hoskinson's charge, the Commission had

made the decision that it is probable that DCS or members of its administration had engaged in unlawful discriminatory practices. A proposed Conciliation Agreement and Consent Order aimed at eliminating the unlawful discriminatory practices and obtaining DCS's voluntary compliance with Ohio's civil rights laws was sent to DCS in compliance with Ohio Rev.Code § 4112.-05(B). DCS was also advised that should conciliation efforts fail, the OCRC would initiate formal proceedings against the school. (Exhibit No. 40).

(17) Subsequent to its initial investigation, the Commission determined, *inter alia,* that:

Evidence and testimony indicate that but for the fact that Complainant is female and selected to have a child, she would have been offered a teaching contract for the 1979–1980 school year. Evidence and testimony also indicate that Complainant's discharge, and the reasons given for it by Respondent, were directly linked to the February 20, 1979 memo which stated that she would not be offered a contract because "If there are pre-school age children in the home we recommend the mother stay there and do not accept her application." Evidence and testimony indicate that Complainant would not have been thus treated had she been a male, and that, therefore, she has been discriminated against because of her sex.

(Exhibit 41).

(18) On February 13, 1980, the OCRC contacted counsel for DCS and advised that DCS had failed to respond with respect to the proffered Conciliation Agreement and Consent Order and had failed to appear at the conference scheduled for informal conciliation and that, informal conciliation having failed, the Commission intended to initiate a hearing on the charge before an administrative hearing examiner. (Exhibit No. 42).

(19) The proposed Conciliation Agreement and Consent Order to which DCS declined to respond or agree would have required DCS to reinstate Mrs. Hoskinson with back pay, and would have prohibited DCS from taking any retaliatory action against Mrs. Hoskinson, or anyone else participating in the proceedings, for having become involved in an action before the Commission. (Exhibit No. 43). The rejected Conciliation Agreement and Consent Order also provided:

. . . . .

E. Respondent will not discharge Complainant without just cause. Respondent will submit to the North Southwest Regional Office of the Commission, copies of any warnings or reprimands given to Complainant during the next one (1) year, and will also notify said office if Complainant is discharged for any reason within the period of one (1) year.

F. Respondent agrees to implement and administer the policies and work rules of the school equally without regard for the employees' handicap, race, sex, religion, age, color, national origin or ancestry.

G. Respondent shall post in a conspicuous place or places on its premises, the Commission's mandatory notice which sets forth excerpts of Chapter 4112, Ohio Revised Code, and other relevant information.

H. Respondent shall not seek information regarding race, color, religion, age, sex, national origin, handicap or ancestry on its form of application, unless a bona fide occupational qualification is certified in advance by the Commission.

I. Respondent shall make clear in its employment contracts that employees may contact the Commission if they believe they are being discriminated against at any time because of handicap, race, sex, religion, age, color, national origin or ancestry.

J. Respondent agrees to establish specific guidelines for employee pregnancy and home child care, to notify all employees in writing of this policy, and to furnish the Commission's

North Southwest Regional Office, within sixty (60) days from the date of ratification of this agreement, proof of compliance with this provision.

K. Not later than thirty (30) days after the effective date of this conciliation agreement and consent order, an authorized officer of the designated Respondent will furnish the North Southwest Regional Office of the Commission a certified check, made to the order of Complainant, for the full amount of back pay stipulated to in paragraph II(b) supra.

*Id.* Having rejected the Conciliation Agreement and Consent Order, DCS was not in any way bound by its terms.

(20) On March 9, 1980, the OCRC contacted counsel for DCS and urged that DCS present a counter offer to the proposed Conciliation Agreement and Consent Order. (Exhibit No. 44).

(21) On April 18, 1980, the Commission filed a Complaint against DCS to initiate an administrative hearing on the charges filed by Mrs. Hoskinson and the ensuing Commission investigation and determination of probable cause that DCS had been or was presently engaging in unlawful discriminatory practices. (Exhibit No. 45). In particular, the Complaint asserted that it was probable DCS had been or was still in violation of ORC § 4112.02(A) (unlawful discrimination on the basis of sex) and (I) (discrimination for having attempted to protect or assert rights under the Ohio Civil Rights Commission Statutes). The hearing was scheduled to commence on August 7, 1980. *Id.* (The hearing was subsequently postponed and rescheduled to take place on October 8, 1980.)

(22) On May 20, 1980, Plaintiffs filed an answer with the OCRC in response to the OCRC complaint.

(23) On October 1, 1980, Plaintiffs filed the complaint in the instant action.

## II. *Applicable Law*

■ In determining whether a permanent injunction should be issued, the Court must first determine whether the Plaintiffs have actually prevailed on the merits of their claim. *Philadelphia Citizens in Action v. Schweiker,* 527 F.Supp. 182, 193 (E.D.Pa.1981); *Sierra Club v. Alexander,* 484 F.Supp. 455, 471 (M.D.N.Y.), *aff'd,* 633 F.2d 206 (2d Cir.1980); *Minnesota Public Interest Research Group v. Butz,* 358 F.Supp. 584 (Minn.1973). If the Plaintiffs in the present matter have established that the exercise of jurisdiction over DCS by the OCRC to investigate Mrs. Hoskinson's allegations would violate Plaintiffs' first amendment right to freedom of religion, then the Court must determine whether a permanent injunction should be granted to prevent the OCRC from exercising that jurisdiction.

The infringement on Plaintiffs' freedom of religion rights, however, must be more than a mere possibility or speculative. In *Detroit Newspaper Publishers Assn. v. Detroit Typographical Union No. 18,* 471 F.2d 872 (6th Cir.1972), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687 (1973), the Sixth Circuit quoted Professor Wright in discussing the "ordinary principles of equity" that must be considered prior to issuing a permanent injunction.

"The classic principles governing availability of injunctions were summarized by Justice Baldwin, sitting at circuit, in 1830: 'There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages. The right must be clear, the injury impending or threatened, so as to be averted only by the protecting preventive process of injunction: but that will not be awarded in doubtful cases, or new ones, not coming within well established principles; for if it issues erroneously, an irreparable injury is inflicted, for which there can be no redress, it being the act of a court, not of

the party who prays for it. It will be refused till the courts are satisfied that the case before them is of a right about to be destroyed, irreparably injured, or great and lasting injury about to be done by an illegal act; in such a case the court owes it to its suitors and its own principles, to administer the only remedy which the law allows to prevent the commission of such act.'

"To this day courts continue to stay their hand until there has been a clear showing of irreparable injury for which there is no other adequate remedy." 3 Barron & Holtzoff, Federal Practice and Procedure (Wright Ed.) § 1431.

*Id.* at 876; *see also, Bradley v. Detroit Board of Education,* 577 F.2d 1032, 1036 (6th Cir.1978); *Roseboro v. Fayetteville City Board of Education,* 491 F.Supp. 110, 112 (E.D.Tenn.1977).

■ If Plaintiffs have demonstrated the requisite real and present danger of irreparable injury, then the Court must weigh the equities between the parties involved to determine how the respective interests of the parties will be affected by the granting or denying of the injunction. *Detroit Newspaper Publishers Assn.,* 471 F.2d at 876; *see also,* 7 *Moore's Federal Practice,* ¶ 65.18[3], p. 163; Wright & Miller, *Federal Practice and Procedure,* § 2942, p. 366–367 (1973). This balancing process involves inquiring into such factors as "the adequacy of another remedy; the benefit to the plaintiff if injunctive relief is granted and hardship if such relief is denied; the hardship on the defendant if injunctive relief is granted; the hardship on third parties; the convenience and effectiveness of administration; and the public and social consequences of either granting or denying injunctive relief." *Philadelphia Citizens in Action,* 527 F.Supp., at 193 *(citing,* 7 *Moore's Federal Practice,* ¶ 65.18[3], at 65–136 to 65–140.1 (1980) ).

These factors are not dissimilar to those delineated by the Sixth Circuit as appropriate for consideration in determining whether a preliminary injunction should be issued. Three of the four factors identified by the court in *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100 (6th Cir.1982), as appropriate inquiries in preliminary injunction proceedings are equally appropriate in permanent injunction proceedings. Specifically, the Court must consider whether the plaintiff has demonstrated irreparable injury, whether the issuance of the injunction "would cause substantial harm to others," and "whether the public interest would be served by issuing" an injunction. *Id.,* at 102. Equally applicable in permanent injunction proceedings is the court's qualification that the "factors guide the discretion of the district court, they do not establish a rigid and comprehensive test ...." *Id., see also, Roth v. Bank of Commonwealth,* 583 F.2d 527, 537 (6th Cir.1978) ("A fixed standard is not the essence of equity jurisprudence....").

The Court, then, must take a careful view of the established facts to ascertain whether and to what extent the Plaintiffs' first amendment right to freedom of religion is in reality threatened by the pending OCRC investigation and hearing. Moreover, if the Court finds that the Plaintiffs' right to freedom of religion is in fact in danger of being impinged upon, the Court must scrutinize and weigh the equities and interests involved to determine the appropriateness of injunctive relief. Finally, if injunctive relief is found to be appropriate, the Court must define with specificity the form and scope of the injunction to be issued. *See, Philadelphia Citizens in Action,* 527 F.Supp. at 193, *citing, Sierra Club v. Alexander,* 484 F.Supp. at 471; *Minnesota Public Interest Research Group v. Butz,* 358 F.Supp. at 584.

III. *The Preliminary Inquiry: The Potential for First Amendment Problems and the Intent of the Legislature*

■ The Plaintiffs' objections to applying the Ohio Civil Rights Commission statutes (ORC Chapter 4112) to the employment practices at Dayton Christian School center on what they perceive to be the resultant conflicts with the religion clauses

of the first amendment. The Court finds, however, that the very fact that application of the Ohio Civil Rights Commission statutes to DCS *could* give rise to conflicts with Plaintiffs' first amendment rights, requires that the Court perform an initial inquiry prior to addressing any substantive constitutional issues raised by Plaintiffs. This preliminary inquiry begins with an examination of the entire statutory scheme in question to determine whether, and to what extent, application of all of its provisions to the Plaintiffs before the Court would give rise to potential conflicts with the Plaintiffs' constitutional rights. If the potential for such conflicts is serious, the Court must search the available sources reflecting legislative intent to determine if the legislature really intended that the statute in question be applied to Plaintiffs. *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 500–501, 99 S.Ct. 1313, 1318–1319, 59 L.Ed.2d 533 (1979). Should it appear that the legislature in fact did not intend that the Plaintiffs be subject to the challenged statutory provision, that is, in the present case, if the Ohio Civil Rights Commission was not intended to have jurisdiction over employers such as DCS, there would be no need for the Court to decide the merits of the first amendment issues raised by Plaintiffs. Instead, the present controversy would be resolved by a determination by this Court that the OCRC could not investigate or conduct a hearing on the charges leveled by Mrs. Hoskinson, not because to do so would run afoul of Plaintiffs' first amendment rights to freedom of religion, but because the state legislature never intended OCRC's jurisdiction to extend so far. The function to be served by this initial inquiry and analysis is to avoid needless determination of constitutional issues if a possible construction of the statute would obviate the apparent conflicts with constitutional rights to which the Plaintiffs object. *Id., EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277, 285 (5th Cir.1981), *cert. denied*, 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982); *Russell v. Belmont*

*College*, 554 F.Supp. 667, 670–71 (M.D. Tenn.1982).

Therefore, the Court's analysis begins with an examination of the entire statutory scheme embodied in the Ohio Civil Rights provisions to determine whether the application of this statutory scheme to DCS would "give rise to serious constitutional questions." *NLRB v. Catholic Bishop*, 440 U.S. at 501, 99 S.Ct. at 1319. In this analysis, the Court focuses on the nature of the institution (Dayton Christian Schools) and the potential activity envisioned under the statute with respect to that institution. *NLRB v. Catholic*, 440 U.S. at 501–504, 99 S.Ct. at 1319–1320; *EEOC v. Southwestern Seminary*, 651 F.2d at 285; *EEOC v. Pacific Press Publishing Assn.*, 676 F.2d 1272, 1276–1277 (9th Cir.1982). *Ritter v. Mount St. Mary's College*, 495 F.Supp. 724, at 726–729 (Md. 1980). Should potential constitutional problems appear likely to arise from application of the OCRC provisions to DCS, then the Court must, as noted above, take a second look to evaluate whether the legislature "clearly expressed an affirmative intention" that the statute grant the OCRC jurisdiction over employers such as DCS. *NLRB v. Catholic Bishop*, 440 U.S. at 500, 99 S.Ct. at 1318 (*quoting, McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21–22, 83 S.Ct. 671, 677–678, 9 L.Ed.2d 547 (1963); *and, Benz v. Compania Naviera Hidalgo*, 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957)).

In undertaking this preliminary examination, the pervasively religious environment of DCS must be kept in mind. Every aspect of the school's operation is geared toward exposing and educating the students on how to lead a Christian life by understanding what the members consider to be the guidance and direction provided by the Bible. As revealed in the testimony at the hearing on this matter and in the exhibits accepted into evidence, the teachers at DCS are selected because of their ability to blend their avowed religious beliefs into every lesson and school activity. Teachers are required to be born again

Christians and to carry with them into their classes the religious fervor and conviction felt necessary to stimulate young minds into accepting Christ as savior. Because of the emphasis placed on the religious education of the students, the school demands that teachers conform both in thought and conduct to the tenets and principles felt essential to leading a Christian life. The belief system espoused by the members of DCS touches every aspect of their life: work, interpersonal relationships, family and recreational activities. Deviation in any way from what is felt to be the proper religious way of life may cast doubt on a teacher's ability to perform his or her critical role and may, therefore, be grounds for dismissal. The powers extended to OCRC under Ohio Rev.Code Chapter 4112: Civil Rights Commission, must be reviewed against this backdrop.

Ohio Rev.Code Chapter 4112 is Ohio's counterpart to 42 U.S.C. § 2000e, et seq., or Title VII, which extends jurisdiction to the federal agency, the Equal Employment Opportunity Commission (EEOC), to eliminate various forms of discriminatory employment practices. Under Title VII, discrimination in an employment setting on the basis of an "individual's race, color, religion, sex, or national origin" is an unlawful employment practice (42 U.S.C. § 2000e–2) which the EEOC is authorized to prevent through the statutorily defined enforcement procedure in 42 U.S.C. § 2000e–5.

Specifically exempted from application of Title VII are religious "corporation[s], association[s], educational institution[s], or societ[ies] with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e–1. This exemption has consistently been construed as permitting a religious employer to discriminate on the basis of religion with respect to employees who are to carry out the religiously oriented work of the employer. *See, e.g., Equal Employment Opportunity Commission v. Mississippi College,* 626

F.2d 477 (5th Cir.1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981); *Ritter,* 495 F.Supp. 724.

■ The statutory scheme of Title VII envisions, and makes allowances for, the states to enact their own statutes aimed at eradicating discriminatory employment practices. If a state has a law prohibiting an alleged unlawful employment practice and an agency authorized to grant or seek relief from such practice, then the complainant must first commence state resolution of the dispute prior to resort to the federal system. *See,* 42 U.S.C. § 2000e–5(c) & (d). Thus, a dual or parallel state and federal scheme for eliminating discriminatory employment practices is permissible under the federal provisions. Furthermore, a state statutory scheme need not mirror in every respect the prohibitions of the federal statutes. State laws are not preempted by the federal statutes except to the extent such laws are inconsistent with the purpose of the federal statutes, or "purport to require or permit the doing of any act which would be an unlawful employment practice under this statute." 42 U.S.C. § 2000e–7; *see also, Shehadeh v. Chesapeake and Potomac Telephone Co.,* 595 F.2d 711 (D.C.Cir.1978); *Ridinger v. General Motors Corp.,* 325 F.Supp. 1089 (S.D.Ohio 1971), *reversed on other grounds,* 474 F.2d 949 (6th Cir.1972).

Ohio Rev.Code Chapter 4112, though similar in many respects to its federal counterpart, appears to some degree to adopt an even broader prohibition against discriminatory practices. For example, Ohio Rev.Code § 4112.02(A) makes it unlawful for any employer to "discharge without just cause, to refuse to hire, or otherwise to discriminate against [a] person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment" on the basis of "race, color, religion, sex, national origin, handicap, age or ancestry."

Additional prohibitions are contained in § 4112.02(E):

It shall be an unlawful discriminatory practice.

(E) Except where based on a bona fide occupational qualification certified in advance by the commission, for any employer, employment agency, or labor organization, prior to employment or admission to membership to:

(1) Elicit or attempt to elicit any information concerning the race, color, religion, sex, national origin, handicap, age, or ancestry of an applicant for employment or membership;

(2) Make or keep a record of the race, color, religion, sex, national origin, handicap, age or ancestry of any applicant for employment or membership;

(3) Use any form of application for employment, or personnel or membership blank seeking to elicit information regarding race, color, religion, sex, national origin, handicap, age, or ancestry . . .;

(4) Print or publish or cause to be printed or published any notice or advertisement relating to employment or membership indicating any preference, limitation, specification, or discrimination, based upon race, color, religion, sex, national origin, handicap, age, or ancestry;

(5) Announce or follow a policy of denying, or limiting, through a quota system or otherwise, employment or membership opportunities of any group because of the race, color, religion, sex, national origin, handicap, age, or ancestry of such group;

(6) Utilize in the recruitment or hiring of persons any employment agency, placement service, training school or center, labor organization, or any other employee-referring source known to discriminate against persons because of their race, color, religion, sex, national origin, handicap, age, or ancestry.

Ohio Rev.Code § 4112.02(E).

Ohio Rev.Code § 4112.99 would make violation of these provisions a misdemeanor of the third degree.

Applying the above cited statutory prohibitions to DCS, the Court finds that those provisions would appear to make it an unlawful discriminatory employment practice for DCS to make a decision to employ a "Born Again" Christian as opposed to someone, for example, adhering to Catholic or Jewish beliefs, assuming such individuals shared equal teaching abilities. Furthermore, the statute would appear to require DCS to get advance approval from the Commission that religion was a "bona fide occupational qualification" before they could question job applicants about their religious beliefs, keep records concerning applicants' religious beliefs, use forms eliciting information about religious beliefs, advertise for teachers holding particular religious beliefs, adopt a policy of hiring only adherents to fundamentalist principles, or accept applicants through any religiously oriented body that recommended only those holding fundamentalist beliefs.

A review of the record in this case makes it clear that if these statutory prohibitions were brought to bear on DCS, the school could be found to be violating each and every limitation. Arguably, they could escape liability under § 4112.02(E) by obtaining approval from the commission that religion is a bona fide occupational qualification.[6] There is no reason to believe that the Commission would be hesitant in granting certification to schools such as DCS, but the fact remains that rather than being able to engage in employment practices that have almost never been seriously questioned, religiously oriented schools such as DCS must now apparently seek approval from the state before they can actively seek out teachers who are adherents to their religious beliefs.[7]

 The Supreme Court has long recognized the highly sectarian role of the teach-

---

**6.** Even if DCS were to obtain from the OCRC certification that religion was a bona fide occupational qualification for purposes of subsection (E) cited above, it is not at all clear that such certification would likewise relieve DCS from the apparent unconditional prohibition con-

tained in subsection (A) against discriminating on the basis of religion in the hiring and firing of employees.

**7.** A curious aspect of this statute, which also prohibits discrimination in matters relating to

er in religiously oriented schools. *Lemon v. Kurtzman,* 403 U.S. 602, 617, 91 S.Ct. 2105, 2113, 29 L.Ed.2d 745 (1971); *NLRB v. Catholic Bishop,* 440 U.S. at 501, 99 S.Ct. at 1319; *Meek v. Pittinger,* 421 U.S. 349, 370, 95 S.Ct. 1753, 1765, 44 L.Ed.2d 217 (1975). The teacher's critical role in propagating the fundamentalist religious tenets at DCS makes it clear that any attempt by the state to limit the ability of DCS to probe into job applicants' religious beliefs or to hire on the basis of religion could result in an impermissible interference of the state into the religious practices of the DCS's administration, its teachers, and its pupils and their parents. That DCS may have to seek certification that religion is a bona fide occupational qualification would cast the Commission into the role of deciding whether religious conviction truly is important in any or all positions at the school. The Commission might willingly and without question extend certifications to schools such as DCS and may choose not to consider complaints that such schools discriminated on the basis of religion, but herein the Court must look for all the risks of first amendment infringement that *could* occur if the Commission's jurisdiction as described in the statute extended to DCS. *NLRB v. Catholic Bishop,* 440 U.S., *supra,* at 502, 99 S.Ct. at 1319.

With respect to DCS, though perhaps not with all religiously oriented schools, § 4112.02(I) also poses a risk of infringing on the members' first amendment rights. This subsection makes it unlawful:

(I) For·any person to discriminate in any manner against any other person because that person has opposed any unlawful practice defined in this section, or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

Ohio Rev.Code § 4112.02(I). The conflict herein results from the religious tenets of the fundamentalists that one must follow the chain of command and never make a bad report. These religious tenets, as described above, founded upon Biblical passages, prohibit one from taking a dispute outside the school's hierarchy. To file a complaint with the OCRC would be seen as a departure from this religious tenet and grounds for dismissal. Section (I), however, would make enforcing this religious tenet an impermissible retaliatory action. This conflict in fact is part of the present controversy. To enforce this provision against DCS could be viewed as resulting in the state depriving the members of their ability to act in accordance with their beliefs by punishing, dismissing or otherwise discriminating against a member who violates this tenet.

Putting aside the troublesome facial prohibition on discriminating on the basis of religion, the prohibitions on the other forms of discrimination could, as applied to DCS, create problems. The controversy presented here bears evidence of the type of conflicts that can arise. Again, what must be kept in mind is the extensive all-

housing under § 4112.02(H), is that § 4112.02(K) provides that:

(K) Nothing in division (H) of this section shall bar any religious or denominational institution or organization, or any charitable or educational organization that is operated, supervised; or controlled by or in connection with a religious organization, or any bona fide private or fraternal organization, from giving preference to persons of the same religion or denomination, or to members of such private or fraternal organization, or from making such selection as is calculated by such organization to promote the religious principles or the aims, purposes, or fraternal principles for which it is established or maintained.

Apparently, the legislature felt that religious institutions could discriminate in favor of their adherents in housing matters but were unwilling to extend this exemption to employment situations. Only the most tortured reading of subsection (K) would allow the Court to apply this exemption to employment situations too. Such a reading would necessitate the court either reading the reference to "division (H)" entirely out of the subsection, or reading "and division A & E" into the statute. The court refrains from exercising such editorial license in light of the apparent legislative intent to have the exemption limited to housing matters only.

encompassing nature of the religious doctrines that guide the activities at DCS. Failure to demonstrate the requisite attitude and temperament can be grounds for a teacher's dismissal. Inherent in such decisions are very subjective sectarian evaluations. Should an individual, however, charge that the religious reasons given for dismissal were but a pretext for sex, race, or some other form of unlawful discrimination, then the Commission would have to evaluate the subjective sectarian decision to determine if it was properly made or if the real reason for dismissal was some form of prohibited discrimination.

Added to this is the further complexity, also presented in this controversy, of religious tenets which, if enforced, could be construed as being a form of impermissible discrimination by DCS. The focus on the home and family of the fundamentalists, for example, leads to the conviction in some that the mother should be at home when the children are young. Yet to terminate a female teacher's contract because she is pregnant is a form of sex discrimination according to Ohio Rev.Code § 4112.01(B). Once again, the Commission could be cast in the role of dictating to the school administration which of its beliefs its members may enforce and, in the alternative, which doctrinal violations they must tolerate and live with.

The potential for intrusion into the administration and operation of DCS is accentuated when the provisions describing the Commission's powers and duties are reviewed. Ohio Rev.Code § 4112.04 provides:

(B) The commission may:

(2) Initiate and undertake on its own motion investigations of problems of employment discrimination;

(3) Hold hearings, subpoena witnesses, compel their attendance, administer oaths, take the testimony of any person under oath, and require the production for examination of any books and papers relating to any matter under investigation or in question before the commission, and may make rules as to the issuance of subpoenas by individual commissioners.

(a) In conducting a hearing or investigation, the commission shall have access at all reasonable times to premises, records, documents, individuals, and other evidence or possible sources of evidence and may examine, record, and copy such materials and take and record the testimony or statements of such persons as are reasonably necessary for the furtherance of the investigation. In such investigations, the commission shall comply with the fourth amendment to the United States Constitution relating to unreasonable searches and seizures. The commission or a commissioner may issue subpoenas to compel access to or the production of such materials, or the appearance of such persons, and may issue interrogatories to a respondent, to the same extent and subject to the same limitations as would apply if the subpoenas or interrogatories were issued or served in aid of a civil action in a common pleas court. No person shall be compelled to be a witness against himself.

The above provisions would permit the Commission to inject itself into the affairs of DCS either on the basis of a complaint filed or on its own motion. Furthermore, § 4112.05 provides the commission can conduct investigations and hearings and

issue and ... cause to be served on such respondent an order requiring such respondent to cease and desist from such unlawful discriminatory practice and to take such further affirmative or other action as will effectuate the purposes of sections 4112.01 to 4112.08 of the Revised Code, including, but not limited to, hiring, reinstatement, or upgrading of employees with, or without, back pay, admission or restoration to union membership, including a requirement for reports of the manner of compliance.

Ohio Rev.Code § 4112.05(G).

Within this procedural framework exists the potential for the Commission to evaluate sectarian decisions, in the context of

hearings and investigations, to prohibit adherence to, or at least actions based upon religious tenets, and, in fact, to require the posting of anti-discrimination statements that may run contrary to the members' religious beliefs. In a school which attempts to permeate every lesson and activity with its religious principles and values, such potential intrusion by the state squarely presents a risk of impermissible state entanglement and interference with the members' religious beliefs and practices.

Whether all of the potential infringements on First Amendment rights occur will depend in part upon how the Commission decides to apply the Civil Rights Commission statutes to schools such as DCS. Not knowing whether or how the Commission may act in the future, the Court can only examine the potential risks and conclude that the application of the Ohio Civil Rights Commission statutes to DCS could, in some instances, raise concerns closely akin to those raised by the Supreme Court, in examining the potential for first amendment infringement should the National Labor Relations Board (NLRB) have jurisdiction to investigate charges of unfair labor practices in parochial schools. There, as herein, "[t]he resolution of … charges …, in many instances, will necessarily involve inquiry into the good faith position asserted by the clergy-administrators and its relationship to the school's religious mission. It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the religion clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB v. Catholic Bishop,* 440 U.S. at 502, 99 S.Ct. at 1319.

■ The Supreme Court has stated that governmentally established religion or governmental interference with religion will not be tolerated. *Walz v. Tax Commission of the City of New York,* 397 U.S. 664, 669, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). In determining whether a particular government action would run afoul of the First Amendment:

Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or *interfere with religious beliefs and practices or have the effect of doing so.* Adherence to the policy of neutrality that derives from an accommodation of the Establishment and Free Exercise Clauses has prevented the kind of involvement that would tip the balance toward government control of churches or governmental restraint on religious practice.

*Walz, supra,* at 669, 90 S.Ct. at 1411 (emphasis added).

■ It was this concern for potential government interference with religion, resulting from the state's evaluation of the reasons for discharge of teachers in a fundamentalist school, that prompted a California District Court to find the California Unemployment Insurance Code unconstitutional as applied to church schools such as DCS. *Grace Brethren Church v. California,* No. CV–79–93 MRP, April 6, 1981 (C.D.Calif.). The potential for state interference with religion as practiced at DCS are no less grave in the instant case and, thus, the Court must take a second look at the statute in question to determine if the legislature "clearly expressed an affirmative intent" that the statute grant OCRC jurisdiction over employers such as DCS. *NLRB v. Catholic Bishop,* 440 U.S. at 501, 99 S.Ct. at 1319.

Unaided by state legislative history to reveal intent, the Court must rely on the language of the statute in an effort to discern whether the Ohio legislature intended Ohio Rev.Code Chapter 4112 to apply to DCS and similar religiously oriented schools. Ohio Rev.Code § 4112.01(A)(2) defines "employer" to include "the state, or any political subdivision thereof, any person employing four or more persons within the state, and any person acting in the interest of an employer, directly or indirectly." Subsection (A)(1) defines "person" as follows:

(1) "Person" includes one or more individuals, partnerships, associations, or-

ganizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and other organized groups of persons. It also includes, but is not limited to, any owner, lessor, assignor, builder, manager, broker, salesman, agent, employee, lending institution, and the state and all political subdivisions, authorities, agencies, boards, and commissions thereof.

Dayton Christian Schools is a non-profit corporation,[8] and if its non-profit status can in any way be seen as distinguishing it from the category of "corporation" in the above provision, then it certainly can still be encompassed in the category of "other organized groups of persons." That the statute was intended to extend to employers such as DCS becomes clearer by the fact that the legislature inserted an exemption for "religious and denominational institutions" from the prohibitions on discrimination in housing. Ohio Rev.Code § 4112.-02(K). Were the prohibitions of Section 4112.02 not deemed to extend to religious institutions such as Dayton Christian Schools, there would, of course, have been no need to make such an exception within the housing provisions of that statutory section.

"Employee" is also broadly defined in § 4112.01(A)(3) as "an individual employed by any employer but does not include any individual employed in domestic service of any person." Nothing in this definition even hints that teachers in parochial schools are not within the ambit of the statute. The statute aims broadly by prohibiting "any employer" from engaging in unlawful discriminatory conduct. Ohio Rev.Code § 4112.02(A). Having demonstrated its ability to create an exception for religious institutions in housing matters in § 4112.02(K), the legislature must be deemed to have clearly intended that there be no exceptions from its outright prohibition against any employer's engaging in discriminatory conduct.

8. *See,* Findings of Fact, *supra.*

■ Inferring the intent of the Ohio legislature with respect to the breadth of the application of Chapter 4112 solely from the language and structure of the statute may appear to provide a basis for discerning legislative intent that falls somewhat short of the "clearly expressed [ ] affirmative intent" standard as discussed in *NLRB v. Catholic Bishop, supra.* Nonetheless, in the present matter, the Court notes that however grave may be the potential for infringement on first amendment rights, the level of potential entanglement is still substantially less than was presented to the Supreme Court in *Catholic Bishop.* Therein the NLRB would not only have had jurisdiction to hear and to decide charges of unfair labor practices, but would also have been deciding the terms and conditions of employment and therefore what matters would be mandatory subjects of collective bargaining. The Supreme Court noted that almost all of the activities in a school setting could be construed as conditions of employment and that requiring collective bargaining on such matters severely encroached on the sectarian administration of the school. *NLRB v. Catholic Bishop,* 440 U.S. at 502–504, 99 S.Ct. at 1319–1320. Though the level of potential interferences with religious matters is grave under Ohio Rev.Code Chapter 4112, it does not present the clear possibility of ongoing and intensive oversight that was threatened in *Catholic Bishop.* Therefore, the Court feels that this lesser showing of affirmative legislative intent is sufficient to support the conclusion that the legislature intended the jurisdiction of OCRC to extend to religious schools such as DCS. Because the Court concludes that the Ohio legislature intended ORC Chapter 4112 to vest the Ohio Civil Rights Commission with jurisdiction over schools such as DCS, the Court must determine whether, notwithstanding this apparent grant of authority to the OCRC, the extension of jurisdiction over DCS to investigate and conduct a hearing on a charge of sex discrimination and retaliatory firing impermissibly infringes on the Plaintiffs' as-

serted first amendment rights to freedom of religion. Prior to reaching the merits of Plaintiffs' freedom of religion claims, however, the Court will first address Plaintiffs' overbreadth and void for vagueness attacks on Chapter 4112.

## IV. Overbreadth

Plaintiffs make a number of constitutional challenges to this statute, including the assertion that it "is a law void on its face for overbreadth." Pointing to the provisions that seemingly prohibit religious employers from discriminating on the basis of religion, Plaintiffs allege that the statute sweeps too broadly in achieving its goal of ending discrimination and in so doing infringes impermissibly on first amendment rights. In addition to all of the potential risks of infringements discussed in Section III of this opinion, Plaintiffs also feel that § 4112.02(E) would prohibit not only an employer, but also a church from seeking religious information from an applicant for membership or from evangelizing or proselytizing by publishing, unless it received prior certification from the Commission. Plaintiffs arrive at this broad interpretation of the statute relying on the following language:

> It shall be an unlawful discriminatory practice:
>
> (E) Except where based on a bona fide occupational qualification certified in advance by the commission, for any *employer*, employment agency, or labor organization, *prior to employment or admission to membership*, to ... [a list of prohibited discriminatory conduct follows].

Ohio Rev.Code § 4112.02(E) (emphasis added).

Plaintiffs assert that this provision makes the prohibitions within that statutory section applicable to employment *and* memberships and since religious organizations can have both employees and members, they are prohibited from seeking, using, or relying upon religious criteria when they are soliciting either employees or members.

■ The standard to apply in determining if a statute sweeps too broadly and infringes impermissibly on constitutionally protected rights is "whether the enactment reaches a substantial amount of constitutionally protected conduct." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). The consequence of finding a statute either overbroad or vague are severe. "A declaratory judgment of a lower federal court that a state statute is invalid *in toto*—and therefore incapable of any valid application—or is overbroad or vague—and therefore no person can properly be convicted under the statute until it is given a narrowing or clarifying construction, will likely have a more significant potential for disruption of state enforcement policies than a declaration specifying a limited number of impermissible applications of the statute." *Steffel v. Thompson* 415 U.S. 452, 474, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505 (1974) (citations omitted). A claim of overbreadth necessitates that the Court determine whether the state, in attempting to regulate conduct admittedly within its power to regulate, has drafted the statute so that it necessarily impinges on constitutionally protected conduct. *See, e.g., Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); *American Communications Assn. v. Douds,* 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950).

■ Turning to the statute at issue here, the Court cannot agree that it is unconstitutionally overbroad. At the outset, the Court rejects Plaintiffs' interpretation that Ohio Revised Code § 4112.02(E) extends, or was even intended to extend, to the church-member relationship. The only logical interpretation to give this statutory provision is that the employer is prohibited from engaging in the proscribed conduct prior to extending employment to an individual, and a labor organization is likewise prohibited from engaging in the proscribed conduct prior to granting membership to an individual. As employers are generally not thought of as granting "admission to membership[s]," that phrase can only be viewed

as referring to the activities of labor organizations that typically do admit members.

Nonetheless, the Court has already noted a number of potential first amendment conflicts that could arise from application of the statute. The question is whether these potential infringements add up to a "substantial amount of constitutionally protected conduct." The statute has the perfectly acceptable objective of eliminating discrimination in employment and housing settings. Though there may be a number of religious employers in the state, most employers are not tied to or involved with sectarian work. Even considering only religious employers, it cannot be said that the statute's apparent prohibition on discriminating on the basis of religion automatically leads to an infringement of religious employers' freedom to exercise their religion. To the extent that religious employers engage in more secular businesses, it becomes increasingly difficult to see how prohibiting them from engaging in religious discrimination could in any way interfere with their religious beliefs. Furthermore, it is not at all clear at this time whether the OCRC will even construe the prohibition against religious discrimination as being applicable to religious employers who are hiring employees to carry out activities related to their religious purposes. Admittedly, the absence of an exemption, such as that in Title VII, for religious employers creates a *risk* of interference with the religious freedoms of some employers, but the risk is not so substantial, especially in view of all the myriad of legitimate applications of the statute, to justify striking the statute down *in toto.*

Nor does the size of the risk increase substantially because religious employers are also prohibited from discriminating on the other bases cited in the statute. That a limited number of religious orders may mandate discrimination against one or more of the subgroups protected in the statute does not merit a finding that the statute poses a substantial threat to the free exercise of religion in the State of Ohio. Moreover, in view of the recent Supreme Court holding in *Bob Jones University v. United States* and *Goldsboro Christian Schools, Inc. v. United States,* —— U.S. ——, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), it is clear that notwithstanding religious tenets underlying racial discrimination, a ban on such discrimination, as contained in the statute at issue herein, would prevail because of what has been determined to be the government's overriding and compelling state interest in eliminating race discrimination in schools.

Because the Court concludes that Chapter 4112 does not necessarily impinge on a substantial amount of constitutionally protected conduct, the Court declines to find the statutory provisions unconstitutional on the grounds of overbreadth.

## V. *Void for Vagueness*

Plaintiffs argue that the statute is void for vagueness. Specifically, Plaintiffs find that the language in 4112.02(A) which makes it unlawful to "discriminate ... with respect to any matter ... indirectly related to employment" is subject to such wide interpretation that the school's administration will be unable to predict whether their conduct falls within the proscription.

▮ As stated above, finding a statute void because it is either overbroad or vague leads to the harsh result of making the statute unenforceable against anyone until it has been given a clarifying construction. *Steffel,* 415 U.S. at 474, 94 S.Ct. at 1223. The test to be applied in reviewing a statute is whether it "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess as to its meaning and differ as to its application." *Zwickler v. Koota,* 389 U.S. 241, 249, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967), *citing, Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

▮ Applying this standard to the statute in question, the Court finds that the statute is not void for vagueness. The pivotal phase in the statute, that is, the conduct which the statute proscribes, is "to

discriminate." In view of the mass of publicity that various forms of discrimination have received over time, it seems clear that a person of common intelligence would be able to understand the conduct at which the statute aims. Quite simply, the statute prohibits an employer from treating one differently without just cause because of that person's age, sex, race, national origin, handicap, religion, or ancestry. The statute lists the following practices as unlawful: "to discharge without just cause, to refuse to hire, or otherwise discriminate ... with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev.Code § 4112.-02(A). This provision is not rendered unconstitutionally vague merely because its area of proscription extends to matters "indirectly related to employment." The legislature sought to remove all vestiges of discrimination from the employment setting and employer-employee relationship. The final catchall phrase could well have been deemed necessary to avoid the possibility of the statute being read narrowly and giving rise, for example, to arguments that the benefit being denied was not really related to employment or the job itself and was therefore outside the scope of the statute. If the employer acts even-handedly in all matters relating to employment, the likelihood of unwittingly running afoul of this provision should be minimal.

To the extent the state's proscription against discrimination is not clearly defined, the Court recognizes that it would be impossible to list or describe all the methods or means by which employers may treat individuals or classes differently because they possess one or more of the listed traits. We are, in fact, still learning the varied and subtle ways that we have used stereotypical criteria or relied upon class generalizations as a basis for determining how we treat or relate to particular individuals. Having made a national commitment, however, to afford each individual an equal opportunity in life, we must live with any vagueness that may be inherent in the word discrimination. In view of the

overriding specificity of the conduct proscribed by ORC § 4112.02(A), the Court cannot conclude that any ambiguity inherent in the phrase "related to employment" is sufficient to render the statute "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Zwickler*, 389 U.S. at 249, 88 S.Ct. at 396. The Court, therefore, declines to find the statute unconstitutional on the basis that the statutory proscription is void for vagueness.

## VI. *Free Exercise Clause*

Plaintiffs contend that the application of Ohio Rev.Code Chapter 4112 to them interferes with their first amendment right to free exercise of religion. In support of this contention, the Plaintiffs emphasize the pervasively religious environment of DCS. The parents of the students, it is urged, send their children to DCS for religious reasons. The school is a means through which they propagate their religious beliefs and any attempt by the state to interfere with the decisions that are made within the school is an impermissible interference with the administration of a religious body. Furthermore, Plaintiffs contend, the decision to terminate Mrs. Hoskinson was based on her violation of the religious belief that one must follow the Biblical Chain of Command and may not make a bad report. By consulting an attorney because her teaching contract had not been renewed, she acted contrary to this religious tenet. Similarly, Plaintiffs urge that to the extent the Court considers the decision to terminate as being based upon the fact she was pregnant, this decision was also founded on religious tenets. As both decisions were based on religious beliefs, Plaintiffs assert that allowing the state to interfere with these decisions would violate their free exercise right.

Defendants assert that no first amendment problem is raised in the present case because neither DCS, Mr. Schindler, nor Mr. Rakestraw had a religious tenet concerning pregnancy which, Defendants argue, was the true reason

Mrs. Hoskinson was fired. The decision to terminate, according to Defendants, stemmed from the personal philosophy of Mr. Schindler and not from any religious convictions. Furthermore, dismissing Mrs. Hoskinson for failing to follow the chain of command was, according to Defendants, a mere pretext. Had the school not discriminated against Mrs. Hoskinson because she was pregnant, she never would have sought legal counsel. Applying a "but for" analysis to the chain of events, Defendants find the two decisions so inextricably intertwined that it can only be concluded that her pregnancy was the sole reason for dismissal.

To the extent the Court finds that the facts in this case present a free exercise of religion problem, Defendants assert that the state has an overriding interest in eliminating invidious discrimination which justifies whatever slight infringement on Plaintiffs' exercise of religion may be found to be imminent. In addition, Defendants emphasize that the Supreme Court has long recognized and protected the freedom of making personal choices in matters concerning marriage and the family. Defendants argue that such privileges, which, according to Defendants, include decisions such as Mrs. Hoskinson's to have a child, should not be denied persons simply because they choose to work in a parochial school.

Before undertaking the analysis of the free exercise claim, the Court feels it necessary to clarify what is disputed in the present matter. Plaintiffs make much of all of the possible ways the statute could be applied to them that would, to varying degrees, interfere with their right to exercise their religion. As discussed in Section III of this opinion, the Court recognizes that the statute *could* be applied in any number of ways that could impermissibly interfere with Plaintiffs' free exercise rights.

However, the majority of concerns raised by the Plaintiffs are at this stage hypothetical or speculative, and the threat of enforcement of all of the potentially troublesome provisions discussed by the Court in Section III lack the "sufficient immediacy and reality" to make them part of the actual justiciable controversy presently before the Court. *See, Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 2779, 73 L.Ed.2d 534 (1982). *O'Shea v. Littleton,* 414 U.S. 488, 496–498, 94 S.Ct. 669, 676–677, 38 L.Ed.2d 674 (1974); *EEOC v. Mississippi College,* 626 F.2d at 487. Similarly, the defendant-college in *EEOC v. Mississippi College,* speculated over the possible manner in which the EEOC could exercise its jurisdiction over the College in such a way that *could* run afoul of the proscriptions in the Religion Clauses of the Constitution. The Fifth Circuit, however, declined to base its ruling on the constitutionality of the EEOC's exercise of jurisdiction on more than the *actual* conduct threatened by the facts presented. *EEOC v. Mississippi College,* 626 F.2d at 487.

Though there may be any number of ways Chapter 4112 could be construed and applied to DCS which could run afoul of the first amendment rights of Plaintiffs, the Commission has not at this juncture attempted to initiate action under all of these potentially troublesome enforcement provisions. Review of the precedents fails to reveal a single instance where the Supreme Court has engaged in speculation over the *possible* applications of a statute in determining whether it impermissibly infringes on first amendment rights. Rather, the Court has only dealt with the constitutional issue when presented with a justiciable controversy involving injury in fact or threatened injury of "sufficient immediacy and reality." *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); *Follett v. McCormick,* 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). *See also, United Public Workers v. Mitchell,* 330 U.S. 75, 89–90, 67 S.Ct.

556, 564–565, 91 L.Ed. 754 (1947) ("The power of courts and ultimately of this Court to pass upon the constitutionality of acts of Congress arises only when the interests of the litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough.")

The only conduct on the part of the Commission that is presently being threatened with sufficient immediacy and reality to present a justiciable controversy is the investigation, which has already taken place, and the pending hearing on the complaint filed by the OCRC concerning the discharge of Mrs. Hoskinson. The issue, then, that is presently before the Court is whether the OCRC may exercise jurisdiction over DCS to investigate and to conduct a hearing to determine if Mrs. Hoskinson was dismissed for the alleged unlawful discriminatory reason that she was pregnant and/or as a result of having attempted to enforce her rights under the OCRC statutes, or whether, in the alternative, the exercise of jurisdiction by OCRC to investigate and to decide this matter would result in an impermissible infringement on Plaintiff's first amendment rights to free exercise of religion.

At the outset, the Court notes that there is nothing about the nature of DCS which would automatically exempt it from the coverage of Chapter 4112. That is, DCS is not a church, nor is the relationship between the teachers and the administration of. DCS a church-minister relationship. Thus, matters concerning employment at DCS are not "matters of church administration and government and thus purely of ecclesiastical cognizance." *McClure v. Salvation Army,* 460 F.2d 553, 559–60 (5th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972). Were decisions with respect to the teachers at DCS properly viewed as ecclesiastical matters, clearly the OCRC could not intervene or attempt to bring the proscriptions of Chapter 4112 to bear upon the institution. *Watson v. Jones,* 80 U.S. 679, 727, 13 Wall 679, 727, 20 L.Ed. 666 (1871); *Gonzalez v. Roman Catholic Archbishop,* 280 U.S. 1, 16, 50

S.Ct. 5, 7, 74 L.Ed. 131 (1929); *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 107, 73 S.Ct. 143, 149, 97 L.Ed. 120 (1952); *Kreshik v. St. Nicholas Cathedral,* 363 U.S. 190, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960); *Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). *See also, EEOC v. Mississippi College,* 626 F.2d at 485; *McClure v. Salvation Army,* 460 F.2d at 560. However religiously oriented may be its educational program, DCS is, as its title bespeaks, a school. The relationship between the administration and the teachers is an employer-employee relationship that courts, when considering similar institutions, have found to be subject to the comparable anti-discrimination proscriptions of Title VII. *EEOC v. Mississippi College,* 626 F.2d at 485; *EEOC v. Southwestern Baptist Theological Seminary,* 651 F.2d at 281. *See also, EEOC v. Pacific Press Publishing Association,* 675 F.2d at 1277. As noted above in Section III, the structure and wording of ORC Chapter 4112 reflect the intent of the Ohio legislature to reach the employment relationship between DCS and its staff and the Court does not find the nature of the institution to be such that this intent of the legislature must be overridden by affording DCS with a blanket exemption from application of Chapter 4112.

As the nature of the institution does not afford a blanket exemption to DCS, then it must be determined whether there is something about the nature and extent of the threatened state action which in this instance impermissibly impinges on Plaintiffs' free exercise rights. In other words, if the OCRC is to be permitted to extend jurisdiction over DCS with·respect to Mrs. Hoskinson's discharge, it may do so either because it would not infringe on Plaintiff's constitutional right of free exercise of their religion, or "because any incidental burden on the free exercise of

[their] religion may be justified by a 'compelling state interest in the regulation of a subject within the State's constitutional power to regulate ....' " *Sherbert v. Verner*, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963), *citing, N.A.A.C.P. v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963). Three factors are considered to determine if a statute, neutral on its face, violates the free exercise clause:

1. the magnitude of the statute's impact upon the exercise of the religious belief,

2. the existence of a compelling state interest justifying the burden imposed upon the religious belief, and

3. the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state.

*EEOC v. Pacific Press*, 676 F.2d 1272, 1279 (9th Cir.1982), *citing, EEOC v. Mississippi College*, 626 F.2d at 488, *citing, Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

The first question that must be addressed is whether the OCRC's exercise of jurisdiction in this matter will burden Plaintiff's free exercise of religion. *United States v. Lee*, 455 U.S. 252–257, 102 S.Ct. 1051–1055, 71 L.Ed.2d 127 (1982); *Wisconsin v. Yoder*, 406 U.S. at 215, 216, 92 S.Ct. at 1533–1534; *Sherbert v. Verner*, 374 U.S. at 403, 83 S.Ct. at 1793. "Only beliefs rooted in religion are protected by the Free Exercise Clause." *Thomas v. Review Board*, 450 U.S. at 713, 101 S.Ct. at 1429. "The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task .... However, the resolution of that question is not to turn upon judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others to merit First Amendment protection." *Id.* at 714, 101 S.Ct. at 1430.

The OCRC seeks to review two actions that were taken with respect to Mrs. Hos-

kinson by the school and its administrators. The first action was that taken by the principal, Mr. Rakestraw, at the behest of Mr. Schindler, the superintendent, when he declined to renew Mrs. Hoskinson's teaching contract because she was pregnant. The second act sought to be reviewed was that of the DCS Board when it terminated Mrs. Hoskinson's contract for the articulated reason that a "serious philosophical difference" existed between the Hoskinsons and DCS as evidenced by Mrs. Hoskinson's failure to follow the Biblical Chain of Command in violation of her employment contract. (Plaintiffs' Trial Exhibit #33, March 26, 1979, Board Resolution.)

The decision made by the two school administrators was described in the notice sent by Mr. Rakestraw as being based on his philosophy that a mother should be at home with her children. (Defendant's Exhibit A, Feb. 20, 1979, Inter-Office Memo to Linda Hoskinson from Jim Rakestraw). In the subsequent letter from Mr. Schindler rescinding the memorandum in which Mrs. Hoskinson's contract was not renewed, Mr. Schindler indicated that

Dayton Christian Schools, Inc., has not changed its policy concerning the need for pre-school children to be in the home and to receive direct love and guidance from Christian parents. However, we have concluded that this is an area that has not been carefully studied and documented. It is our intention to diligently and prayerfully search the Scriptures for guidance in this area. After this has been accomplished, we will be better prepared to formulate school policy in this area.

(Defendants' Exhibit C, March 27, 1979, letter from Mr. Schindler to Linda Hoskinson). Mr. Schindler also testified that he felt that specific passages from the Bible mandated such a view or philosophy. This belief, however, was not reflected in any of the school's writings, such as the school's constitution, the teacher's manual, or the teacher's contract.

█ Defendants urge that the evidence establishes that the decision not to renew

Mrs. Hoskinson's contract resulted from a personal philosophy of the administrators and not from religious beliefs. In support of this interpretation, Defendants cite *Fiedler v. Marumsco Christian School,* 631 F.2d 1144 (4th Cir.1980), and *Brown v. Dade Christian Schools, Inc.,* 556 F.2d 310 (5th Cir.1977). Both of these opinions provide support for the idea that the Court should focus on defining what constitute the religious beliefs and practices of the institution. Under this line of reasoning, it would appear that only those practices based upon articulated, agreed upon, and well established religious beliefs of the institution should receive first amendment protection. Conduct not based on institutional religious beliefs may be classified as resulting from personal philosophy or policy and not deserving of First Amendment protection.

The Court, however, finds this analytical approach deficient in that it fails to recognize or accord due regard for the free exercise rights of the individual members of an institution or church. Furthermore, this approach is at odds with clear Supreme Court precedent that has always recognized the right of the individual to have his own set of religious beliefs. *United States v. Lee,* 455 U.S. at 257, 102 S.Ct. at 1055; *Thomas v. Review Board,* 450 U.S. at 716, 101 S.Ct. at 1431; *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971).

> Intrafaith differences [of what is 'scripturally' acceptable] are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses. One can, of course, imagine an asserted claim so bizarre, so clearly non-religious in motivation, as not to be entitled to protection under the Free Exercise Clause; but that is not the case here, and the guarantee of free exercise is not limited to beliefs which are shared by all members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

*Thomas v. Review Board,* 450 U.S. at 715–716, 101 S.Ct. at 1430–1431.

Accordingly, the Court is not willing to say that because a religious belief is not generally held or is not documented, or because it is newly arrived upon, that it is not deserving of first amendment protection. *See, Brown v. Dade Christian Schools, Inc.,* 556 F.2d 310, 317 (5th Cir. 1977) (J. Goldberg, concurring).

■ The record reveals that Mr. Schindler sincerely believes the Bible requires that the mother be at home with her young children, and that his decision that Mrs. Hoskinson's contract not be renewed was based upon his religious conviction that to allow her to continue teaching while she had a small child at home would be to run afoul of the teachings in the Bible. The Court cannot accept Defendants' contention that the initial decision not to renew Mrs. Hoskinson's contract was prompted solely by Mr. Schindler's personal philosophy and that, therefore, OCRC review of that decision could not even raise potential first amendment concerns. Though the belief may not be documented or as well known or accepted as other precepts discussed during the proceeding, the evidence clearly establishes that Mr. Schindler's conduct was based upon religiously founded principles. The Court does not feel it proper to relegate this personally held religious belief to an artificial lesser status of "personal philosophy" simply because the belief might not have been a clearly articulated tenet at DCS. The Court finds, therefore, that the initial decision not to renew Mrs. Hoskinson's teaching contract was founded on religious precepts and therefore falls within the ambit of the first amendment's protection afforded to the free exercise of religion.

■ The Board's decision to discharge Mrs. Hoskinson because she had not followed the Biblical Chain of Command and

the requirement of always giving a good report is a decision more clearly founded in religious beliefs as the record reveals that this belief is both well articulated and generally held and ascribed to by the DCS staff and administration. The Teacher's Contract, for example, emphasizes and requires conformance with what is viewed as the Biblical means of arbitrating disputes internally, never taking a dispute "before a court of law". Mrs. Hoskinson acknowledged when signing the contract as well as in her application for employment that she believed in "God's chain of command." (Doc. # 25, answer to question 10). Nonetheless, in contravention of this principle, Mrs. Hoskinson consulted an attorney when she learned her contract would not be renewed. Thus, when the Board made the determination that Mrs. Hoskinson's contract should be terminated because of "philosophical differences" stemming from her taking her complaint about the nonrenewal of her contract to an attorney, this decision was consistent with the Board's expressed and established religious belief that disputes be resolved internally and in accordance with the Biblical Chain of Command.

■ Both decisions made with respect to Mrs. Hoskinson's continued employment at the school were, therefore, a means for Plaintiffs to carry out, or to put into practice, their religious beliefs. Having determined that both decisions which OCRC seeks to review involved the exercise of Plaintiffs' religious beliefs, the Court must now examine the extent to which the investigation and pending hearing would burden the free exercise of Plaintiffs' religious beliefs and whether any burden that may arise can be justified because of the existence of a compelling state interest which will be furthered by conducting such an investigation and hearing. *Sherbert v. Verner*, 374 U.S. at 403, 83 S.Ct. at 1793. The inquiry first focuses on the magnitude of the infringement, or impact upon, Plaintiffs' free exercise rights. Within this analysis, the courts try to determine how great a burden the state is attempting to place on the complainants' right to practice their religion. Not infrequently, this analysis involves attempting to determine whether the asserted religious belief upon which the state seeks to impinge is *central* to the overall religious doctrine of the complainants. *Yoder*, 406 U.S. at 216, 92 S.Ct. at 1534; *EEOC v. Pacific Press*, 676 F.2d at 1279; *EEOC v. Mississippi College*, 626 F.2d at 488; *Sequoyah v. T.V.A.*, 620 F.2d 1159, at 1164 (6th Cir.1980); *Lakewood, Ohio Congregation of Jehovah's Witnesses v. Lakewood*, 699 F.2d 303 at p. 306 (6th Cir.1983).

In *Wisconsin v. Yoder*, for example, the Court examined the religious practice which the Amish sought to protect from state interference to assess the impact that denying continuation of that practice would have upon the Amish religious community generally. The religious belief and corresponding practice at stake in *Yoder*, was the conviction that after the eighth grade, Amish children should continue their education within the Amish community. The Amish wished to avoid exposing their children to values and beliefs diametrically opposed to those of the Amish way of life which exposure would have resulted were their children to continue with formal secondary education outside the Amish community as was ostensibly mandated by the state law at issue. Thus, in *Yoder*, the Court found that enforcement of the state's mandatory school attendance law on the Amish community would not only have the effect of forcing the Amish to act in a manner contrary to their religious beliefs and practices, but would also result in removing the children from the Amish community during the "crucial and formative period" which would create a barrier to the child's eventual integration into the Amish community. 406 U.S. at 216–19, 92 S.Ct. at 1533–35. Because the Amish religious beliefs and their way of life are so inextricably intertwined, wrenching the children out of the home and community and teaching them values and subjects contrary to the beliefs held by the Amish was viewed as having a potentially devastating effect on the continuation of this religious sect. The

practice of educating their children at home after the eighth grade was viewed as so *central* to the perpetuation of the Amish faith that it overrode the state's lesser interest in mandatory formal education beyond the eighth grade.

 Thus, the question of the centrality of a religious belief sought to be regulated or burdened by the state requires a determination of the extent to which the threatened state infringement would interfere or limit Plaintiffs' ability to continue to believe and practice their espoused religious tenets. What is *not* involved in the determination of centrality is an evaluation of which beliefs asserted by the plaintiffs are more important or form the "real" tenets of the Plaintiffs' faith. To engage in such a substantive evaluation of a Plaintiffs' asserted religious beliefs would involve the Court in the sort of scriptural interpretation for which the courts are quite ill-suited. *U.S. v. Lee*, 455 U.S. at 257, 102 S.Ct. at 1055; *Thomas v. Review Board*, 450 U.S. at 715, 101 S.Ct. at 1430.

 To begin with, the Court notes that the threatened state action in the present matter does not give rise to concerns over the future viability of the complainants' religion such as were presented to the Supreme Court in *Yoder*. Quite the contrary, the action the state proposes to take at this juncture would appear to impinge only slightly on Plaintiffs' free exercise rights. The extension of OCRC jurisdiction over DCS to conduct an investigation into a charge of sex discrimination and retaliatory employer actions, would enable the OCRC to interject itself into the dispute resolution process at DCS. Were the Commission to determine, as it did in the instant matter, that probable cause exists that DCS was or is acting in a prohibited discriminatory fashion, DCS would either have to voluntarily settle the dispute (by agreeing to a consent decree and conciliation order or by proffering an acceptable offer of its own) or face having charges filed against it and defending itself at an administrative hearing. During the investigative and hearing process, certain staff and administrators at

DCS would find themselves having to respond to Commission inquiries and to relate their impressions of the events giving rise to the charges. Moreover, if an aggrieved employee sought legal assistance or if an employee participated in an OCRC investigation or hearing, DCS could not discriminate or act adversely towards that employee for so acting. Though to DCS, such action would constitute a valid ground for dismissal for what would be viewed as a violation of the Biblical Chain of Command, to the OCRC, such action would constitute a violation of the prohibition against retaliatory employer conduct. All of this procedure would also require Plaintiffs to involve an outside party in the resolution of certain of their disputes despite their avowed belief in the internal resolution of differences through adherence to the Biblical Chain of Command and the proscription against giving a bad report. There is nothing in the record, however, to suggest that there will be frequent or recurring clashes between Plaintiffs' employment practices and the statute's proscriptions against sex discrimination. In all likelihood, the majority of disputes arising within the school will continue to be resolved internally. The unknown and possibly non-existent future charges of sex discrimination that may be leveled at the school and spur involvement of the OCRC cannot be viewed as creating any sort of substantial risk of impingement by the state into Plaintiffs' exercise of their religious belief of adherence to the Biblical Chain of Command and their desire to require that their employees resolve disputes internally. For the most part, Plaintiffs will continue to be free to believe and to practice their belief in the internal resolution of differences. The Court concludes, therefore, that the OCRC investigation and hearing presently at issue and any occasional and as yet uncertain future investigation and hearings on charges of sex discrimination and retaliatory employer action provide but a brief and infrequent imposition upon Plaintiffs' belief that disputes be resolved internally.

The instant controversy, however, raises the concern that a second religious belief, shared by at least some of the Plaintiffs, will be impinged upon if the OCRC hearing is allowed to go forward. This second religious belief, that the mother should be at home with her young children, led to the initial nonrenewal of Mrs. Hoskinson's contract despite the prohibition in Chapter 4112.02(A) and 4112.01(B) that an employer not take discriminatory actions against a woman because she is pregnant. To the extent the espoused belief of the mother's role in the home leads to administrative decisions which conflict with the prohibitions against sex discrimination, denying the administration the freedom to act on this belief would not appear to place more than a minimal burden on the Plaintiffs' free exercise rights. Those who believe that the Bible requires the mother of young children to be at home and not work are left free to exercise or put into practice that religious belief. Nothing in Chapter 4112 would force any of the Plaintiffs themselves to act contrary to this belief. Unlike in *Yoder*, for example, where application of the challenged statutory provisions to the Amish would have required them to act in a fashion contrary to their religious beliefs by sending their children to public schools at a time when their beliefs dictated educating them within the community, there is no statutory requirement in Chapter 4112 that the woman must work or must leave the home despite her desire to stay at home and tend to the upbringing of her children. Thus none of the parents, teachers, or administrators at DCS would themselves be forced to engage in conduct violative of their religious beliefs were the proscriptions against sex discrimination in employment contained in Chapter 4112 brought to bear on DCS. Instead, all that would be asked of Plaintiffs is that they not take adverse employment action against a woman if she does not concur in their interpretation of what the Bible requires of a mother. Thus, as with the infringement on Plaintiffs' belief in the Biblical Chain of Command, the Court finds that the threatened impingement on the

asserted belief of at least some of the Plaintiffs that a mother be at home with her young children will be only minimally and in fact only tangentially, burdened should the OCRC exercise its jurisdiction over the instant matter.

Even though the Court finds that the threatened burden on Plaintiffs' free exercise rights is, at this stage, only minimal, *any* burden imposed by the state on free exercise rights must be justified by a *compelling* state interest. *Sherber v. Verner*, 379 U.S. at 403, 83 S.Ct. at 1793.

In examining the asserted state interest, the Court finds that the state does in fact have a compelling interest in eliminating all forms of discrimination. This interest of the state parallels that of the federal government as reflected in the enactment of Title VII. *See, EEOC v. Pacific Press*, 676 F.2d at 1280; *EEOC v. Mississippi College*, 626 F.2d at 489; *EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d at 277, 286 (5th Cir.1981). In *Pacific Press*, the Court stated that "[b]y enacting Title VII, Congress clearly targeted the elimination of all forms of discrimination as a 'highest priority.' " *EEOC v. Pacific Press*, 676 F.2d at 1280, *citing*, S.Rep. No. 872, 88th Congr., 2d Sess. pt. 1 at 11, 24 (1964); and *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974). Likewise, the Supreme Court has recognized and sought to protect women from what it has viewed as a history of severe and pervasive discrimination against them. *See, Mathews v. Lucas*, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976). In *Frontiero v. Richardson*, 411 U.S. 677, 684, 93 S.Ct. 1764, 1769, 36 L.Ed.2d 583 (1973), the Court reviewed the history and detrimental and wasteful effect of discrimination against women and discussed the Congressional intent to end such discrimination through passing Title VII of the Civil Rights Act of 1964.

Coupled with this concern for eliminating discrimination is the concern for protecting the "freedom of personal choice in matters of marriage and family life."

*Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 640, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974) *citing, Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). In *LaFleur,* for example, the Court found that restrictive maternity leave regulations at a school could serve to penalize the pregnant teacher for having exercised her protected freedoms. *Cleveland Board of Education v. LaFleur,* 414 U.S. at 640, 94 S.Ct. at 796.

The Ohio Legislature has also sought to protect women's rights and freedom of personal choice in determining to bear children through Ohio Rev.Code Chapter 4112 which prohibits, *inter alia,* discrimination in employment and housing on the basis of sex. Subsequently, the legislature confirmed its concern about discrimination against women by adding the clarifying language of § 4112.01(B) to make clear that discrimination "on the basis of sex" or "because of sex" includes:

> (B) For the purposes of divisions (A) to (F) of section 4112.02 of the Revised Code, the terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, any illness arising out of and occurring during the course of pregnancy, childbirth, or related medical conditions. Women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work....

In view of the clear mandate of Chapter 4112, the Court simply cannot conclude that Ohio shares any less of a compelling interest in eliminating all forms of discrimination, including sex discrimination, than

that expressed by Congress or the Supreme Court. Moreover, because the state does have a compelling interest in eliminating the various forms of sex discrimination, the state likewise has a compelling interest in insuring that individuals be free to protect their rights under Chapter 4112 without fear of employer reprisal. The right not to be subjected to invidious discrimination would be but a hollow right if an employer were free to retaliate against employees for attempting to protect or aid others in protecting their rights under Chapter 4112. The Court finds, therefore, that though the exercise of jurisdiction by the OCRC over DCS to investigate and conduct a hearing on a charge of sex discrimination and/or retaliatory employer action may infringe incidentally or minimally on Plaintiffs' free exercise rights, any burden resulting is founded upon a compelling state interest in eliminating sex discrimination in employment.

■■■ The remaining factor to be considered is the extent to which the state's interest would be frustrated if the exemption sought were in fact granted. In *EEOC v. Mississippi College,* the Fifth Circuit, in deciding if a Baptist college should be exempted from Title VII, looked at the nature of the institution seeking exemption and the impact on society that would result from granting exemptions to comparable institutions. The Court concluded:

> Although the number of religious educational institutions is minute in comparison to the number of employers subject to Title VII, their effect upon society at large is great because of the role they play in educating society's young. If the environment in which such institutions seek to achieve their religious and educational goals reflects unlawful discrimination, those discriminatory attitudes will be perpetuated with an influential segment of society, the detrimental effect of which cannot be estimated.

*EEOC v. Mississippi College,* 626 F.2d at 489.

Similarly, in *EEOC v. Southwestern Baptist Theological Seminary,* the Fifth

Circuit again looked to the "quantitative and qualitative" impact on society that would stem from granting exemptions from VII to institutions such as the one presently before the Court. *EEOC v. Southwestern Baptist*, 651 F.2d at 287. The role the institution in question played in educating and influencing the young was again emphasized, along with the potentially deleterious impact on the young as well as on the goal of eliminating discrimination, of having youth educated in "an atmosphere of discrimination." *Id.*

In considering the impact on the state's interest should the requested exemption from the social security laws be granted, the Supreme Court in *United States v. Lee* found it could not allow the Amish to be exempted from paying social security taxes despite having found that nonpayment of such taxes was founded upon religious beliefs. The Court emphasized that the social security system would be "difficult to accommodate ... with myriad exceptions flowing from a wide variety of religious beliefs." *United States v. Lee*, 455 U.S. at 260–61, 102 S.Ct. at 1056–57.

In other instances, the Court has looked to the administrative burdens that would result from creating exemptions for similarly situated individuals or groups. In *Thomas v. Review Board*, for example, accommodating the claim of the Jehovah's Witness who sought unemployment compensation after having quit his job for religious reasons, did not present any serious risk of multiple similar future claims nor, therefore, any consequent administrative problems. *Thomas v. Review Board*, 450 U.S. at 719, 101 S.Ct. at 1432. Similarly, in *Wisconsin v. Yoder*, the Court felt the exemption it was creating from the state's compulsory education law was sufficiently narrow that "few other religious groups or sects" would qualify. *Wisconsin v. Yoder*, 406 U.S. at 236, 92 S.Ct. at 1543.

The common thread that runs throughout these cases is the concern, not just for the ability of the state to accommodate the exception currently sought, but also for what granting this particular exemption would portend for the future of the state's interest. As noted by Justice Goldberg in his concurring opinion in *Brown v. Dade Christian Schools, Inc.*:

> When a court can recognize a free exercise claim without inviting numerous additional claims, focusing on the particular consequences of the ruling in the case at bar is appropriate. But when recognizing the claim will predictably give rise to further claims, many of which will undoubtedly be fraudulent or exaggerated, the situation is different.

*Brown v. Dade Christian Schools, Inc.*, 556 F.2d at 322 (J. Goldberg, concurring).

In determining the extent to which granting DCS's exemption from Chapter 4112 would "impede the objectives sought to be advanced by the state," the Court must be mindful, as in the opinions cited above, of the process it may be setting in motion. The age and concomitant impressionability of the children attending DCS probably render them more vulnerable to the influence of their environment than might be older students attending college. Exposure to an educational atmosphere wherein any form of unlawful discrimination is practiced could have a substantial impact on the values these children eventually carry out into the world when they leave school. Furthermore, the cumulative impact on the state's goal of ending discrimination could be significant if comparable religiously oriented schools and places of business likewise sought and were to receive exemptions from the prohibitions contained in Chapter 4112. The exemption sought herein is neither so narrow nor unlikely of repetition that the Court need not be concerned about the likelihood of setting in motion what could well be a whole series of complaints from employers seeking exemptions from all or part of the anti-discrimination provisions contained in Chapter 4112, and, quite conceivably, the comparable proscriptions contained in Title VII.

To the contrary, the Court finds the number of recent challenges by religious employers to the jurisdiction of the EEOC under Title VII is at least some evidence of

the likelihood other religious employers may want to be exempted from Chapter 4112. *See, e.g., EEOC v. Pacific Press,* 676 F.2d 1272; *EEOC v. Mississippi College,* 626 F.2d 477; *EEOC v. Southwestern Baptist,* 651 F.2d 277; *Dolter v. Wahlert High School,* 483 F.Supp. 266 (N.D.Iowa 1980); *McClure v. Salvation Army,* 460 F.2d 553; *Ritter v. St. Mary's College,* 495 F.Supp. 724; *Brown v. Dade Christian Schools, Inc.,* 556 F.2d 310; *Fiedler v. Marumsco Christian School,* 631 F.2d 1144. As claims for additional exemptions were presented to this Court,

> [T]he court [would have to] either recognize many such claims ... or draw fine and searching distinctions among various free exercise claimants. The latter course would raise serious constitutional questions with respect to the proper functioning of courts in sensitive religion clause adjudication. Courts are of course competent to sort sincere from insincere religious contentions, but the process of doing so, and of striking different balances when confronted with sincere claims posing subtle variations in religious dogma, inevitably embroils courts undesirably in religious controversies. When numerous claims are likely, recognizing some while rejecting others unavoidably forces courts to pick and choose among religions and to draw subtle distinctions on the basis of criteria with which no governmental unit should ever become entangled.

*Brown v. Dade Christian Schools, Inc.,* 556 F.2d at 332 (J. Goldberg, concurring).

The Court finds, therefore, that though the extension of OCRC jurisdiction over DCS to investigate and to conduct a hearing on Mrs. Hoskinson's discharge may impinge to a limited degree on Plaintiffs' free exercise rights, the state has a compelling and overriding interest in eliminating sex discrimination in the employment setting. As the Supreme Court recently reaffirmed in *United States v. Lee,* "every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs." *United States v. Lee,* 455 U.S. at 261, 102 S.Ct. at 1057. "Not all burdens on religion are unconstitutional." *Id.* at 257, 102 S.Ct. at 1055, *citing, Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Reynold v. United States,* 98 U.S. 145, 8 Otto 145, 25 L.Ed. 244 (1879). *See also, Bob Jones University v. United States,* — U.S. ——, 103 S.Ct. at 2034–35, 76 L.Ed.2d 157 (1983). Though two religious beliefs may arguably be burdened somewhat by allowing the OCRC to investigate and to conduct a hearing on charges of sex discrimination and retaliatory employer conduct at DCS, the state's interest in eradicating invidious discrimination and in providing protection to those who seek to vindicate their rights under Chapter 4112 are sufficiently compelling to justify the slight impingement that may result on Plaintiffs' free exercise rights. Furthermore, the Court finds that granting the exemption sought could lead to a course of events that would "embroil the courts undesirably in religious controversy" and substantially undermine the state's objective of eradicating discrimination. Thus, the Court finds that Plaintiffs' free exercise rights would not be unconstitutionally burdened by having the OCRC exercise jurisdiction over the disputed termination of Mrs. Hoskinson.

## VII. *Establishment Clause*

Plaintiffs also contend that extension of jurisdiction over DCS by the OCRC will violate the constitutional prohibition against the state's establishment of religion because jurisdiction will lead to an excessive amount of entanglement in the school's sectarian affairs.

The first amendment commands that there shall be "no law respecting an establishment of religion." Though hardly presenting a clear proclamation of what the state may not do, the courts have generally found establishment clause problems when the state has acted in some way to benefit religious institutions generally, or provided some sort of benefit to some, but not all religious groups. *See, e.g., Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct.

504, 91 L.Ed. 711 (1947); *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). To the extent a particular religion or religious practice is claimed to have been burdened or regulated or inhibited by the state, such claims have generally been couched in terms of free exercise clause challenges.

Establishment Clause problems, however, may also arise when the state attempts to insert itself too deeply into the management and administration of a church or religious institution. As the Court in *Walz v. Tax Commissioner* explained, the forbidden areas of state conduct under the Establishment Clause are "sponsorship, financial support, and *active involvement of the sovereign in religious activity*." *Walz v. Tax Commissioner*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411 (emphasis added). The *danger* of "active involvement" is that, to the extent the state becomes an active participant in the decision-making process of a church or religious institution or attempts to guide policy, or discretionary or disciplinary decisions, over time it is apt to find itself at loggerheads with church officials over doctrinal matters that are interwoven with all of these administrative functions. Whenever the state attempts to replace church or religious official's decisions in such matters with its own, it is in effect engaging in conduct "respecting the establishment of a religion." "A given law might not *establish* a state religion but nevertheless be one 'respecting' that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment." *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

The Supreme Court has articulated a test to be applied to determine if a statute results in the state running afoul of the Establishment Clause. Three requirements must be met if the statute is to pass constitutional muster: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be that it neither advances nor inhibits religion, *Board of Education v. Allen*, 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968); finally, the statute must not foster 'an excessive government entanglement with religion.' *Walz v. Tax Commissioner*, 397 U.S. at 673, 90 S.Ct. at 1413." *Lemon v. Kurtzman*, 403 U.S. at 612–13, 91 S.Ct. at 2111–12.

Focusing on the last factor, the Court in *Lemon* emphasized that "prior holdings do not call for total separation between church and state, total separation is not possible in an absolute sense ... judicial caveats against entanglements must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship .... Thus we must examine the form of the relationship for the light that it casts on the substance." *Id.* at 614, 91 S.Ct. at 2112.

What is eminently clear from the language of the Supreme Court is that this is an area given neither to precise or pat rules nor to generalizations among situations that fail to take account of real differences. Determining whether there is the likelihood of *excessive* government entanglement offensive to the first amendment requires an examination of the "character and purposes of the institutions that are benefited [or burdened], the nature of the aid [or burden] that the State provides [or imposes], and the resulting relationship between the government and the religious authority." *Id.* at 615, 91 S.Ct. at 2112. *See also, Catholic Bishop*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979); *EEOC v. Pacific Press Publishing*, 676 F.2d 1272 (9th Cir.1982); *EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir.1980); *EEOC v. Southwestern Baptist*, 651 F.2d 277 (5th Cir.1981); *Grace Brethren Church of California*, No. CV–79–93 MRP, April 6, 1981, (C.D.Calif.).

Turning to the statute in the present matter, the Court finds that it has the secular purpose of eliminating unlawful discriminatory practices in employment, housing and debtor-creditor matters. To

accomplish this purpose, it provides for the establishment of the Ohio Civil Rights Commission with specified powers to respond to complaints or to initiate investigations of unlawful discriminatory practices. The primary effect of the statute "neither advances nor inhibits religion" but rather has the effect of accomplishing its clear purpose of eradicating unlawful discrimination.

In determining if the statute at issue fosters excessive government entanglement, the Court once again must emphasize the pervasively religious character of the school. The Court need not repeat what it has said above about the origin, structure, and mission of DCS. In cases involving similarly religiously oriented schools, the Supreme Court has repeatedly emphasized the danger inherent when the government acts within these schools either through aid or regulation. In either instance, by financial support or presence through regulation, the "substantial religious activity and purpose" of such schools gives rise to the threat of forbidden church-state entanglement. *Lemon, supra,* 403 U.S. at 615, 91 S.Ct. at 2112. *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *see also, Catholic Bishop, supra; Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, *supra; Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, *supra.* The question, then, must focus on how far the state may intrude into such schools without becoming *excessively* entangled.

To determine if excessive government entanglement is threatened by the OCRC in this matter, the Court must address the facts that have actually been presented. As stated above in Section VI, the issue to be resolved is whether the OCRC may exercise jurisdiction over DCS to investigate and to conduct a hearing upon a charge of sex discrimination without violating the first amendment rights of Plaintiffs. In particular, the inquiry here is whether the exercise of jurisdiction by OCRC to investi-gate and to conduct a hearing on the charges would result in excessive government entanglement in the affairs of DCS.

■ The Court notes that the present action was brought when the OCRC proceedings were still at a preliminary stage. To take into account all of the possible levels of government entanglement that *could* have resulted depending upon any number of possible outcomes that might have occurred had the threatened hearing gone forward would be to engage in the determination of hypothetical questions long held to present nonjusticiable controversies. *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); *Thorp v. Housing Authority of City of Durham,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); *Socialist Labor Party v. Gilligan,* 406 U.S. 583, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972); *Brown & Root, Inc. v. Big Rock Corp.,* 383 F.2d 662 (5th Cir.1967).

■ The only harm immediately threatened herein is the degree of government entanglement threatened by attempting to investigate and to conduct a hearing on whether DCS engaged in or is continuing to engage in discriminatory conduct prohibited by ORC §§ 4112.02(A) (sex discrimination) and (I) (retaliatory employer practices). In *Dolter v. Wahlert High School,* 483 F.Supp. 266 (N.D.Iowa 1980), the Court examined whether hearing and determining a sex discrimination charge filed by a teacher against a parochial school would lead to excessive government entanglement in the religious practices of the school. Comparing the entanglement threatened by the NLRB in *Catholic Bishop* to that threatened should the court exercise jurisdiction, the court found "[s]uch expansive scrutiny into the day-to-day administration of defendant's school would not in the least be required in this case." *Id.* at 270.

Similarly, in *Russell v. Belmont College,* 554 F.Supp. 667 (1982), the court analyzed whether the Equal Pay Act could apply to a "pervasively sectarian" college without re-

sulting in excessive entanglement. The Court reasoned,

> [N]o relationship is created between Belmont and the federal government until Belmont College violates or is alleged to have violated the Act. Then Belmont College is subject only to limited investigation and de novo judicial determination. While this may impose some minimum burden on Belmont, the resulting limited relationship created with the federal government leads this Court to conclude ... that application of the EPA to Belmont College will not "foster excessive government entanglement with religion.

*Id.* at 678.

Having found Title VII to grant the EEOC jurisdiction over a religiously based college, the Court in *Mississippi College* did not find requiring and enforcing compliance with a *Subpoena ad Testificandum/Duces Tecum* to result in excessive entanglement despite the fairly expansive amount of information sought. *EEOC v. Mississippi College*, 626 F.2d at 489. The Court analyzed the degree of entanglement resulting from Title VII being brought to bear in the Baptist College.

> The relationship between the federal government and the College that results from the application of Title VII does have limits both in scope and effect. It is true that the subpoena issued to the College by the EEOC presages a wide ranging investigation into many aspects of the College's hiring practices. Furthermore, should the EEOC conclude that cause exists to believe that the College discriminates on the basis of sex or race, the College in all likelihood would be subjected to a court action if it did not voluntarily agree to alter its actions. The College would, however, be entitled to a de novo determination of whether its practices violate VII. In that action the College could reassert the protection of the first amendment prior to being ordered to amend its practices. If the challenged employment practices survived the scrutiny of the district court, the EEOC could not attack again those particular practices absent some change in circumstances.

In *Pacific Press*, again reviewing the question of entanglement between the state and a church related company which would result from the application of Title VII, the Court found that "[t]he present case is distinguishable from *NLRB v. Catholic Bishop* because neither the judgment in this suit nor Title VII's enforcement mechanisms result in any ongoing scrutiny of [Pacific] Press' operations. The potential for ongoing entanglement or continuous supervision of church affairs by the government's negotiations is the critical entanglement issue which deserves the most emphasis." *EEOC v. Pacific Press*, 676 F.2d 1272, 1282 (9th Cir.1982).

The enforcement procedure currently challenged poses no more threat of ongoing, continuous supervision than that presented under Title VII. Arguably, Title VII may be seen as having even less potential for leading to entanglement than ORC Chapter 4112 because the EEOC lacks the power given to the OCRC to initiate its own investigations. Nonetheless, the hypothetical level of entanglement resulting from an OCRC initiated investigation that may or may not ever be initiated in the future, is not presently before this Court. Whatever entanglement of the state into the religious affairs at DCS that may result from this investigation and the threatened hearing, or that may stem from any future charges of sex discrimination, will be sufficiently limited both in length and in the degree to which they intrude into the overall operation of the school, that any fears of excessive government entanglement are minimal. Thus, what is lacking at this stage is any indication that the investigation and hearing on charges of sex discrimination and retaliatory employer practices will necessarily result in the sort of hovering omnipresence of the OCRC in the affairs of DCS which would run afoul of the Establishment Clause's prohibition against excessive government entanglement in religion. The Court concludes that the occasional intrusion of the OCRC into

the administration of DCS to respond to charges of sex discrimination and retaliatory employer practices will not lead, based upon the facts now before the Court, to an excessive level of government entanglement in Plaintiffs' religious beliefs and practices and thus does not run afoul of the proscription contained in the Establishment Clause of the United States Constitution.

## VIII. *Conclusion*

Having reviewed all of the evidence presented in this matter, the Court concludes that the exercise of jurisdiction by the OCRC over Dayton Christian Schools to investigate the charges of sex discrimination and retaliatory employer actions and to conduct a hearing as part of said investigation would not appear *at this juncture* to impermissibly impinge on Plaintiffs' first amendment rights to freedom of religion. This is not a conclusion that the Court reaches lightly or without concern for the course of events that may follow. Throughout this decision and entry, the Court has repeatedly emphasized the narrowness of the issue actually presented. The Court has also noted above some of the troublesome ways in which the Ohio statute *could* be brought to bear on DCS. In permitting the OCRC to exercise jurisdiction over the instant controversy, the Court has in no way determined either that the full force of OCRC's jurisdiction under ORC Chapter 4112 can be brought to bear on DCS without impermissibly burdening Plaintiffs' first amendment rights or, even with respect to the present controversy, that any remedy deemed appropriate by the OCRC should they find DCS liable, would necessarily present no further first amendment problems. However, because many of the concerns voiced by Plaintiffs about state encroachment on their religious freedoms remain as yet only possibilities, they cannot serve as the basis for the issuing of a permanent injunction against the OCRC. Limited by the facts presented to it, the Court must decline to grant the equitable relief sought. Without in any way intending to downplay Mrs. Hoskinson's rights under ORC Chapter 4112, the Court can only express, the hope that in any future proceedings that may be conducted, due regard be given to Plaintiffs' sincerely held religious beliefs and that every effort be made to impose no greater burden than is absolutely necessary to resolve the instant controversy.

The Court finds, therefore, that Plaintiffs have not succeeded on the merits of their claim in that the statutory provisions granting OCRC jurisdiction are not unconstitutionally overbroad or void for vagueness, nor does the exercise of jurisdiction by the OCRC over the present dispute impermissibly impinge on Plaintiffs' free exercise rights or result in excessive government entanglement in religion. The Court is unable to grant the permanent injunction which Plaintiffs seek in this action.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.